IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

GREGORY BRENT CHRISTIAN,

   Petitioner,

v.              Case No.: 3:05-cv-00879

DAVID BALLARD, Warden,
Mount Olive Correctional Complex

   Respondent.

## PROPOSED FINDINGS AND RECOMMENDATIONS

 Pending before the Court are Petitioner's *pro se* Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 39); Respondent's Motion for Summary Judgment (ECF No. 54); Petitioner's Cross-Motion for Summary Judgment (ECF No. 60); and two discovery motions filed by Petitioner (ECF Nos. 58 and 59). By standing order, this case was referred by the Honorable Robert C. Chambers, United States District Judge, to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). As a preliminary matter, the undersigned notes that the record before the Court is well-developed and provides a sufficient basis upon which to resolve this case without need for an evidentiary hearing. *See* Rule 8, Rules Governing Section 2254 Cases. After thorough consideration of the record, the undersigned conclusively **FINDS** that (1) there are no *material* factual issues in dispute and (2) Christian is not entitled to the relief requested. Therefore, for the reasons that follow, the undersigned

respectfully **RECOMMENDS** that the District Court **GRANT** Respondent's Motion for Summary Judgment; **DENY** Petitioner's Petition for a Writ of Habeas Corpus, Cross-Motion for Summary Judgment, Motion to Engage in Discovery, and Motion for Production; and **DISMISS** this case from the docket of the court.

## I.    Relevant Facts and Procedural History

In the early morning of June 4, 2002, officers of the Huntington, West Virginia Police Department went to the residence of Ms. Tammy Maynard looking for Petitioner, Gregory Christian ("Christian"), a suspect in a recent armed robbery. Ms. Maynard allowed the police inside, but when they entered, gunshots were exchanged between Officer J. T. Combs and Christian. Officer Combs fired 11 shots; Christian fired 4 shots, one of which struck Officer Combs in the chest. Christian was subsequently arrested.

Police interviewed Christian, Tammy Maynard, and Richard Adams, all three of whom had been in the residence at the time of the shooting. During the course of interviewing Richard Adams, he admitted to assisting Christian with the armed robberies of a Pizza Hut restaurant and a Marathon gas station during the two days prior to the shooting. On September 13, 2002, Christian was named in a three count indictment, *State v. Christian*, 02-F-160, which included two counts of First Degree Robbery and one count of Malicious Assault on a Police Officer. (ECF No. 39 at 18). Public defender Gerald Henderson ("Henderson") was appointed to represent Christian.

On September 2, 2003, Christian entered a guilty plea in the Circuit Court of Cabell County, West Virginia to two counts of first degree armed robbery and one count of malicious assault on a policeman. (ECF No. 54-1 at 5). Christian was

sentenced to 25 years of imprisonment for each armed robbery count, to run concurrently with each other but consecutively to a federal sentence he was already serving, and to an additional 3 to 15 years of imprisonment for the assault count, to run consecutively to all other sentences. (*Id.* at 7-8). Christian did not appeal his convictions, (ECF No. 55 at 2), or immediately seek post-conviction relief in the Circuit Court of Cabell County. (*Id.* at 2-3). Instead, on three separate occasions, in 2003, 2004, and 2005, Christian petitioned the West Virginia Supreme Court of Appeals for a writ of habeas corpus, all of which were denied. (ECF No. 54-1 at 10-12).

On November 4, 2005, Christian filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the Southern District of West Virginia. (ECF No. 2). Because Christian had not sought habeas relief from the Circuit Court of Cabell County, he had not satisfied the exhaustion requirements under § 2254. (*Id.* at 1). Accordingly, on June 20, 2007, United States Magistrate Judge Maurice Taylor recommended that the District Court deny Christian's petition, retire the action to the inactive docket of the court pending exhaustion of West Virginia state court remedies, and order Christian to file a habeas petition in the Circuit Court of Cabell County within thirty days of the court's order. (ECF No. 33 at 2). The District Court adopted the Magistrate Judge's Proposed Findings and Recommendations and ordered Christian to exhaust his available state remedies before pursuing his federal habeas action. (ECF No. 35 at 2).

On July 6, 2007, Christian filed a Petition for a Writ of Habeas Corpus in the Circuit Court of Cabell County, which was assigned Case No. 07-C-0572. (ECF No. 54-1 at 14). On November 30, 2010, the Circuit Court of Cabell County held an omnibus hearing on the State habeas petition. (ECF Nos. 54-7, 54-8). On February 11, 2011, the

Circuit Court issued a twenty-two page decision denying Christian's petition for writ of habeas corpus, which he then appealed to the West Virginia Supreme Court of Appeals. (ECF Nos. 54-4 at 5-41). On June 29, 2012, the West Virginia Supreme Court denied Christian's habeas appeal and adopted the Circuit Court's decision in full after having "carefully considered the merits of each of petitioner's arguments as set forth in his brief and in his reply brief." (*Id.* at 48-49).

On July 12, 2012, Christian renewed his § 2254 petition in federal court and filed a Motion to Lift the Stay and Abeyance Order so as to pursue his federal habeas claims. (ECF Nos. 39, 40, 41). On September 4, 2012, the undersigned granted Christian's motion and ordered the respondent to answer Christian's petition within thirty days. (ECF No. 38).[1] Thereafter, both parties filed motions for summary judgment.

## II.   Petitioner's Claims

Christian asserts the following grounds in support of his § 2254 habeas petition:

1.     Ineffective assistance of counsel. In short, Christian argues that Henderson failed to perform an objectively reasonable investigation of the State's evidence and failed to file viable defense motions. Christian claims that counsel induced him to plead guilty to conceal counsel's woefully inadequate representation. Moreover, Christian disputes his counsel's contention that the defense was tailored to Christian's early confession and his desire to obtain the lightest possible sentence.

2.     Prosecutorial misconduct. Christian alleges that the prosecutor withheld exculpatory evidence and evidence that could have been used to impeach the State's

---

[1] Christian's renewed § 2254 petition was assigned a separate case number, 3:12-cv-03084. Upon granting Christian's motion to lift the stay on his original § 2254 action, the undersigned further ordered the Clerk of Court to close 3:12-cv-03084 and re-docket all of documents in 3:05-cv-0879. (ECF No. 38 at 2).

witnesses.

3.     Absence of a knowing and voluntary guilty plea. According to Christian, if Henderson had performed a proper examination of the evidence, he would have realized the weakness of the State's case. In Christian's view, the evidence demonstrates clearly that two other individuals, Josh Dietz and Michele Black, committed the armed robberies and that Officer Combs was shot by his partner, not by Christian. Christian argues that if Henderson had mounted a defense and communicated with him, he would not have entered a guilty plea.

4.     Actual innocence. Christian claims that he is innocent of all of the charges and has repeatedly professed his innocence. He asserts that he pled guilty based upon misrepresentations made by his counsel regarding the strength of the prosecution's case and the length of sentence he could receive if convicted by a jury. (ECF No. 39 at 5-11).[2]

## III.   **Standards of Review**

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in state custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  When determining the merits of a § 2254 petition, the district court applies the standard set forth in § 2254(d), which

---

[2] Christian also apparently assigns error to the Circuit Court of Cabell County, which presided over his state habeas petition, based upon the court's wrongful denial of his (1) Motion to Engage in the Process of Discovery; (2) Request for an appointed investigator to assist in developing his habeas claims; and (3) Motions to Expand the Record. (ECF No. 40 at 83-87). However, "claims of error occurring in a state post-conviction proceeding cannot serve as a basis for federal habeas corpus relief." *Lawrence v. Branker*, 517 F.3d 700, 717 (4th Cir. 2008) (quoting *Bryant v. State of Maryland*, 848 F.2d 492 (4th Cir. 1988)). Accordingly, these claims are rejected as meritless.

provides that the habeas petition of a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" is:

(1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1) and (2). Moreover, the factual determinations made by the state court are presumed to be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Thus, when reviewing a petition, the federal court uses "a highly deferential lens." *DeCastro v. Branker,* 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and independent meanings. *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision warrants habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams,* 529 U.S. at 405) (internal quotations omitted). A habeas writ may be granted under the "unreasonable application" clause if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies

it to the facts of the particular case." *Id.* at 300-01 (internal marks omitted).

Accordingly, the AEDPA limits the habeas court's scope of review to the reasonableness, rather than the correctness, of the state court's decision. A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must also be unreasonable." *Williams*, 529 U.S. at 365. Moreover, as discussed in greater detail in Part IV.A, *infra,* the standard of review under the § 2254 unreasonable application clause in the context of an ineffective assistance of counsel claim is considerably more focused and emphasizes the deference that must be given to a state court's determinations. *See Harrington v. Richter,* 131 S.Ct. 770, 778, 178 L.Ed.2d 624 (2011).

In addition to the limitations inherent in the review of a federal habeas petition, a guilty plea further diminishes the scope of plausible challenges under § 2254. Because a voluntary and intelligent guilty plea amounts to an admission of the material elements of the charged crime, *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), it constitutes a waiver of *all claims* relating to non-jurisdictional errors that occurred prior to the plea, including claims relating to alleged constitutional deprivations. *U.S. v. Partlow*, 301 Fed.Appx. 297 (4th Cir. 2008) (citing *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973)); *See also United States v. McCleary,* 112 F.3d 511, 1997 WL 215525 (4th Cir. 1997) (unpublished). The Fourth Circuit has stated as follows:

> In *Tollett,* the Supreme Court explained that 'a guilty plea represents a break in the chain of events which has preceded it in the criminal process.' As a result, '[w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to entry of the

guilty plea.'

*Id.* at *2, citing *United States v. Broce,* 488 U.S. 563, 569, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989) (internal citations omitted).  As a result, a § 2254 motion in the context of a guilty plea is normally restricted to an attack on the voluntary or intelligent nature of the plea. The "focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea not the existence as such of an antecedent constitutional infirmity." *Tollett*, 411 U.S. at 266.

Here, both parties have moved for summary judgment. Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller &, Mary Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). Consequently, motions for summary judgment impose a heavy burden on the moving party; for, it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.,* 906

F.2d 972, 974 (4th Cir. 1990).

Nonetheless, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50). With these standards in mind, the undersigned addresses the claims raised by Christian.

**IV.   Discussion**

### A. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate ... defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88, 694. In the context of a guilty plea, the "performance"

prong of the *Strickland* standard is the same: whether counsel's representation fell below an objective standard of reasonableness. *Hill v. Lockhart*, 474 U.S. 52, 58-59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). To establish prejudice in the face of a guilty plea, the movant must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."[3] *Id.* at 59. The lack of a formal record or history of how the charges played out at trial "works against the party alleging inadequate assistance." *Premo v. Moore*, ___ U.S. ___, 131 S.Ct. 733, 745, 178 L.Ed.2d 649 (2011). When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. Counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," *Wiggins v. Smith*, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

In a § 2254 proceeding, the standard of review differs somewhat from the standard used in the direct review of a *Strickland*-based challenge. *Harrington*, 131 S.Ct. at 785. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem review is 'doubly' so." *Id.* at 788 (internal citations omitted). "'Surmounting *Strickland's* high bar is never an easy task[;]' ... Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010)). Instead of asking whether defense counsel's performance fell below an objectively reasonable standard, the federal

---

[3] Any claims of ineffective assistance of counsel concerning constitutional or statutory violations that "occurred prior to [a defendant's] guilty plea and [are] unrelated to it" are foreclosed from review. *Fields v. Attorney General of State of Md.,* 956 F.2d 1290, 1296 (4th Cir. 1992) (citing *Tollett v. Henderson*, 411 U.S. 258 (1973)).

habeas court must determine "what arguments or theories supported, or could have supported the state-court decision; and then ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with a prior decision of [the United States Supreme] Court." *Id.* at 786. The question, then, is not "whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 788. Consequently, a "state court's determination that a [*Strickland*] claim lacks merit **precludes** federal habeas relief so long as 'fair-minded jurists could disagree' on the correctness of that decision." *Id.* at 786 (citing *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)) (emphasis added).

Christian identifies multiple deficiencies in his trial counsel's representation. (ECF No. 40 at 26-74). The undersigned addresses the state court's determination with respect to each of his claims.

### 1.  Counsel's Failure to Notify the Court of a Conflict

Christian argues that trial counsel "had an ethical duty to inform the trial court of the conflicts he and [Christian] were having." (ECF No. 40 at 29). He alleges that trial counsel "vigorously pressured" him into pleading guilty in spite of Christian's repeated requests to take his case to trial, and "in order to cover-up for his lack of trial preparations." (*Id.* at 26-28). Christian also claims that he "made numerous written and verbal complaints to various agencies with regards to counsel's inadequacies," and that counsel therefore harbored animosity toward him. (*Id.* at 28). Accordingly, Christian contends that counsel was obligated to notify the trial court about his "conflict" with Christian, and his failure to do so therefore constituted ineffective assistance of counsel. (*Id.* at 29).

Christian argues that because "[t]he state courts never addressed and/or resolved [his] claim that there existed a conflict between [him] and his counsel," the provisions of § 2254(d) are inapplicable. (ECF No. 57 at 17). Although the West Virginia Supreme Court of Appeals did not explicitly address Christian's conflict of interest claim, it summarily denied Christian's habeas petition after having "carefully considered the merits of each of petitioner's arguments as set forth in his brief and in his reply brief." (ECF No. 39 at 17). The very first assignment of error addressed in Christian's state habeas appeal brief is the conflict of interest claim presented here. (ECF No. 54-4 at 35). Because "§ 2254(d) applies even where there has been a summary denial," *Cullen v. Pinholster*, 131 S.Ct. 1388, 1402, 179 L.Ed.2d 557 (2011); *see also Richter*, 131 S.Ct. at 784-85, the role of this Court is to determine whether the state court's denial of Christian's conflict of interest claim "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts" in light of the evidence. 28 U.S.C. § 2254(d).

Christian cites *Cuyler v. Sullivan* for the proposition that "[d]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial." 446 U.S. 335, 346, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). It is well established that "the right to effective assistance includes the right to representation free from conflicts of interest," as "lawyers owe their clients a duty of loyalty, including the duty to avoid conflicts of interest." *Rubin v. Gee*, 292 F.3d 396, 401 (4th Cir. 2002) (citing *Sullivan*, 446 U.S. at 348-50). To establish ineffective assistance of counsel based upon a conflict of interest, the petitioner must prove that "(1) petitioner's lawyer operated under a

'conflict of interest' and (2) such conflict 'adversely affected his lawyer's performance.'" *United States v. Nicholson*, 611 F.3d 191, 205 (4th Cir. 2010) (quoting *Sullivan*, 446 U.S. at 348). Although "[a]dverse effect cannot be presumed from the mere existence of a conflict of interest," once it is shown, "prejudice will be presumed and the [petitioner] need not demonstrate a reasonable probability that, but for the attorney's conflict of interest, the trial's outcome would have been different." *Rubin*, 292 F.3d at 401-02.

Here, Christian misunderstands the nature of the term "conflict of interest." He identifies the primary "conflict" between himself and counsel as stemming from their differing opinions regarding appropriate plea negotiation and trial strategy. (ECF No. 40 at 28). However, "mere disagreement about strategic litigation decisions is not a conflict of interest." *United States v. Fields*, 483 F.3d 313, 353 (5th Cir. 2007). Furthermore, "[t]he Sixth Amendment does not guarantee a friendly and happy attorney-client relationship." *United States v. Mutuc*, 349 F.3d 930, 934 (7th Cir. 2003); *see also Jackson v. United States*, 638 F.Supp.2d 514, 538 (W.D.N.C. 2009) ("[A]lthough the Petitioner may not have liked him, [trial counsel] was dogged and zealous in his representation of the Petitioner."); *Mosley v. United States*, Case No. DKC o7-cv-1520, 2011 WL 1230888, at *2 (D. Md. Mar. 29, 2011) (holding that petitioner's "claims that counsel was not working in his 'best interest' and that he and counsel had several 'heated exchanges' do not establish ineffective assistance").

The only potential source of conflict that Christian actually identifies is his filing of multiple complaints regarding counsel's representation. (ECF No. 40 at 28). During the omnibus hearing in Christian's state habeas proceeding, trial counsel acknowledged that Christian had written several letters to Public Defender Services

regarding counsel's representation, as well as filed a complaint with the "lawyer's disciplinary board in Charleston, WV." (ECF No. 54-8 at 8). However, as the Fourth Circuit has observed, "the Supreme Court never has suggested that a conflict between defendant and lawyer arising from a wholly separate proceeding-one that ... had no bearing upon the attorney's ability zealously to represent [him] at trial-requires automatic reversal of a conviction." *United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993) (finding no conflict of interest where petitioner filed a state bar grievance regarding counsel's representation); *Mosley*, 2011 WL 1230888, at *2 n.1 (D. Md. Mar. 29, 2011) (same). Christian has not offered any explanation as to how his attorney "could have gleaned any advantage for himself in disciplinary proceedings before the state bar by failing to employ his best exertions" on Christian's behalf, nor does the record contain any "evidence tending to show that [his] attorney failed to represent him in an objectively reasonable manner." *Burns*, 990 F.2d at 1438. In fact, in his December 4, 2002 letter to the Director of the West Virginia Department of Administration, trial counsel detailed his discussions with Christian and rationale regarding appropriate trial strategy and further indicated that "Mr. Christian has advised me that he is sorry for the letter and attributes it to his length of time in solitary confinement at the Cabell County Jail." (ECF No. 54-9 at 7-8). Additionally, the record reflects that when asked about his counsel's services during the plea colloquy, Christian expressed his satisfaction with Henderson's representation. (ECF No. 54-6 at 72). Accordingly, the state court's rejection of Christian's conflict of interest claim was neither contrary to, nor involved an unreasonable application of federal law and was not an unreasonable determination of the facts in light of the record.

### 2.  Counsel's Failure to Investigate Exculpatory Evidence

Christian argues that trial counsel failed to adequately investigate or discover exculpatory evidence regarding the malicious assault charge, as well as both of the robbery charges. (ECF No. 40 at 30, 45). He alleges that he was misled as to the strength of the case against him due to counsel's lax investigation, and that he would not have pleaded guilty had counsel discovered the exculpatory evidence that Christian later obtained himself. (*Id.* at 57-61). The state habeas court found that "Counsel's decision not to investigate statements and evidence was ... not ineffective assistance, especially in light of Petitioner's statement that he had committed the crimes alleged." (ECF No. 39 at 34). As discussed below, this determination was not unreasonable or contrary to federal law.

Under *Strickland*, defense counsel's duty to investigate requires counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 690–91. Defense counsel's "investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities." *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (quoting 1 ABA Standards for Criminal Justice, 4-4.1 (2d ed. 1982 Supp.). Likewise, "as with any record of an accused's statements made in police custody, and especially a statement volunteered without the benefit of a lawyer's advice, the notes should [be] parsed to ascertain not only the havoc the accused might have wreaked upon his defense, but also any boon he may have unwittingly bestowed." *Tice v. Johnson*, 647 F.3d 87, 104 (4th Cir. 2011); *see also Rompilla*, 545 U.S. at 387 (endorsing the ABA's recommendation that "[t]he duty to investigate exists regardless of the accused's admissions or statements to the lawyer of

facts constituting guilt or the accused's stated desire to plead guilty").[4] However, "a court's review of counsel's decision not to investigate is highly deferential in light of the circumstances at the time of counsel's representation." *Strickland*, 466 U.S. at 691. As the Supreme Court has explained,

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id.* Moreover, even where counsel could have made a more thorough investigation, the proper inquiry into claims of ineffective assistance is "not what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp,* 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (quoting *United States v. Cronic,* 466 U.S. 648, 665 n.38, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). Thus, in order to be successful on this type of claim, a petitioner must explain what useful evidence would have been obtained from the additional interviews or meetings. *See Bassette v. Thompson,* 915 F.2d 932, 940-41 (4th Cir. 1990) (rejecting petitioner's "general claim that additional witnesses should have been called in mitigation").

---

[4] The current version of the ABA Standards, which omits the term "always," now states that "investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities." *ABA Standards for Criminal Justice: Prosecution and Defense Function* (3d ed. 1993). The Supreme Court has indicated that it sees "no material difference between these two phrasings, and in any case cannot think of any situation in which defense counsel should not make some effort to learn the information in the possession of the prosecution and law enforcement authorities." *Rompilla*, 545 U.S. at 387 n.6.

### a. Malicious Assault on a Police Officer

According to Christian, there existed "salient evidence point[ing] toward the possibility that Officer Combs was shot by his back-up partner," despite the fact that Christian apparently admitted both to police and to trial counsel that he shot Officer Combs. (ECF No. 40 at 30). Christian believes that Respondent's exhibits, which include police records, ballistics reports, property receipts, and an FBI write-up, "inherently show[] that Officer Combs was not shot by Petitioner, but that he was actually struck by an HPD bullet instead." (*Id.* at 30). Christian therefore concludes that trial counsel must have "overlooked or decided not to read certain discovery documents provided to him by the State." (ECF No. 57-1 at 4, 6). Christian argues that but for counsel's failure to investigate, there is a reasonable probability that he would have insisted on going to trial, and "the likely outcome of a trial would have been favorable toward [him]." (*Id.* at 5-6). Christian's argument is unpersuasive.

To begin with, Christian devotes most of his energy to explaining how various police records, ballistics results, and the FBI report demonstrate that Officer Combs was shot by his back-up partner, rather than by Christian. (ECF No. 40 at 30). Christian's belief that trial counsel "simply overlooked or decided not to read certain discovery documents provided to him by the State," appears to be based entirely upon Christian's conclusory assumption that "[h]ad counsel properly reviewed the State's discovery file then he would have discovered salient evidence" supporting this back-up partner theory. (ECF No. 57-1 at 3-4). Certainly, trial counsel would have been remiss for failing to read or review information provided by the prosecutor, but contrary to Christian's belief, the record indicates that Henderson examined the relevant police records and other discovery produced by the State.

During the omnibus hearing, trial counsel specifically testified that, "I had a discovery conference, and then of course I had the discovery to go through to see statements, and there were pictures and there was an FBI report that I looked at, so I was looking at the evidence the state was going to rely on." (ECF No. 54-7 at 33). Trial counsel later reiterated that he "reviewed the discovery which had the pictures, the FBI report, [Christian's] taped statement, the statements from the police officers" and his conversations with Christian "as to what happened and what didn't happen." (*Id.* at 40). Regarding the photo lineup pictures, trial counsel testified that he "would have filed a motion to preclude in court identification because of the tainted photos." (*Id.* at 41). Regarding the FBI report, trial counsel testified that "we discussed how it could have been interpreted possibly in [Christian's] favor because of the location of the bullets, et cetera, we talked about that." (*Id.*). Thus, it appears that trial counsel did in fact review the evidence provided by prosecution and the police department.

Moreover, as the state habeas court observed, Christian admitted both to police and to his trial counsel that he in fact shot Officer Combs. The record contains statements from three HPD officers to whom Christian voluntarily stated that he shot Officer Combs in the chest, and that at the time he believed he was shooting an individual he had previously robbed. (ECF No. 54-2 at 53-55). These statements are corroborated by the transcript of Christian's taped interview at the HPD, dated June 4, 2002, in which he stated, "I went into the kitchen and all I seen was this guy like coming right toward me and I said, I thought that it, it was the guy that I robbed for drugs, I thought it was that and I shot and then after I shot, I think I fired two shots, then I seen the guy by the door in a uniform, I realized this was the police, and I stepped back." (ECF No. 54-4 at 72). Likewise, during the omnibus hearing, trial

counsel testified that Christian told him he had shot Officer Combs without realizing he was a police officer. (ECF No. 54-7 at 25-26). Trial counsel repeatedly stated that his contemporaneous interview notes reflected that Christian had personally admitted shooting Officer Combs, but maintained that he did not know he was an officer at the time of shooting. (*Id.* at 25-27). This testimony is corroborated by the interview notes themselves. (ECF No. 39-2 at 34). The state habeas court could reasonably have found that it was not ineffective assistance for trial counsel to limit his investigation of the shooting based upon Christian's admissions.

Finally, the undersigned regards Christian's attempt to assign error to counsel's representation for failing to discern and investigate his tenuous "back-up partner" theory with deep skepticism, particularly in light of Christian's admission to counsel that he had shot the officer. "[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383 (citing *Wiggins*, 539 U.S. at 525; *Strickland*, 466 U.S. at 699; *Burger*, 483 U.S. at 794).

Christian's belief that the law enforcement records "inherently show[] that Officer Combs was not shot by Petitioner, but that he was actually struck by an HPD bullet instead," would have required trial counsel to indulge in several severely tenuous inferences. (ECF No. 40 at 30). First, Christian points to a June 4, 2002 Evidence Log which lists 11 HPD casings but only 10 corresponding bullets recovered. (ECF Nos. 39-1 at 40; 54-3 at 7-8). Christian argues that the bullet recovered from Officer Combs was the eleventh HPD bullet, and that this is reflected in the June 4, 2002 Property Record, which lists 11 casings and 11 corresponding bullets ("slugs") recovered. (ECF Nos. 39-1

at 40; 54-3 at 26). This claim ignores the HPD report of the incident, which states that:
"On 6-4-2 the scene was initially processed, but only 10 of the rounds were collected on
that day. On 6-5-02 [Officer] Castle obtained another search warrant for the apartment
and along with [Officer] Bowles returned to the scene at about 1000 hrs. *Retrieved the
last round* and also recovered money from inside a pillow case on a bed in the living
room and from under the mattress of a bed in the southeast bedroom." (ECF No. 54-3
at 6) (emphasis added).

Second, Christian claims that HPD misidentified the bullet that struck Officer
Combs as a .32 caliber bullet, rather than a .40 caliber HPD bullet. (ECF No. 57 at 49).
This claim ignores relevant Bureau of Alcohol, Tobacco and Firearms reports, which
together identify the bullet that struck Officer Combs as a caliber .32 S&W lead bullet.
(ECF No. 54-9 at 5). According to ATF Property Inventory/Forfeited Property
Appraisal Reports, law enforcement recovered the following items attributed to
Christian: 1) a .32 caliber revolver, four spent shell casings, one live round in the
cylinder of the revolver, and one bullet that was lodged in a wall, were recovered from
the apartment, (ECF Nos. 54-3 at 6; 54-9 at 2); 2) a second bullet, which struck Officer
Combs, was recovered at the hospital, (ECF Nos. 54-3 at 5; 54-9 at 3); and 3) "4 live .32
S&W rounds and 1 spent .32 S&W casing" were recovered "from the pocket of Gregory
Brent Christian," (ECF No. 54-9 at 2). Ultimately, the Bureau of Alcohol, Tobacco and
Firearms Laboratory Report, dated July 29, 2002, identified all five spent cases as
"caliber .32 S&W cartridge cases, Remington-Peters brand," identified all five live
rounds (or cartridges) as "caliber .32 S&W cartridges, Remington-Peters brand," and
identified both recovered bullets as "caliber .32 S&W lead bullets, which were fired
from a barrel(s) rifled with five (grooves), right twist." (ECF No. 54-9 at 4-5). The ATF

Lab Report further states that "[a]lthough the rifling impressions on [each bullet] are like those produced by the [recovered] revolver, they have insufficient individual microscopic markings present to identify or eliminate them as having been fired from the [recovered] revolver" and "also have insufficient individual microscopic markings present to identify or eliminate them as having been fired from the same barrel." (ECF No. 54-9 at 5). While the examination was unable to conclude that the bullet that struck Officer Combs was fired from Christian's revolver, nothing contained in the report supports Christian's claim that the bullet was a .40 caliber HPD bullet.

Third, Christian questions whether "the bullet alleged to have struck Officer Combs" even exists, (ECF No. 57 at 49), despite the vast evidence that Officer Combs was shot. Christian apparently bases this query, in part, on his observations that (1) the bullet recovered from Officer Combs was taken into ATF custody "nearly a full week later" than the other ammunition and firearm evidence. (ECF No. 57 at 49); and (2) the ATF Property Inventory/Forfeited Property Appraisal Report states that a spent bullet was "recovered from clothing of Huntington Police Officer Joseph E. Combs at Cabell Huntington Hospital," (ECF No. 54-9 at 3), whereas the Crime Scene Follow-Up Report analyzing the bullet holes in Officer Combs' shirts, (ECF Nos. 39-1 at 39; 54-3 at 9-10), does not mention that a bullet was recovered in the clothing. (ECF 57-1 at 1). Furthermore, Christian claims that all four of the rounds he shot were essentially "accounted for," and therefore the bullet that shot Officer Combs could not have been his. (*Id.* at 2). According to Christian, one bullet was fired through the flower pot on the TV stand, one bullet was recovered from the inside wall, one bullet was fired into the floor, and the fourth bullet was retrieved by HPD and misidentified as the "last round" of HPD bullets collected by Officers Bowles and Castle at the apartment on

June 5, 2002. (*Id.*). Christian's assessment, however, is contradicted by the HPD report of the incident, which concludes that one bullet struck Officer Combs, one bullet passed through some flower pots sitting on the TV and was not found, one bullet was recovered from inside the wall, and "if a fourth round was fired it most likely passed through the open front door" and was not recovered either. (ECF No. 54-3 at 5-6). This accounting is mirrored in the FBI Report dated June 4, 2002. (*Id.* at 29-30). During Christian's preliminary hearing, trial counsel asked Officer Johnson if he knew where the bullet holes in the apartment were located, to which he responded, "There's a bullet hole, I believe, to the left of where Officer Combs was. There was one in the floor near where he was standing and there was one in his chest." (ECF No. 54-6 at 20). Although this testimony is arguably inconsistent with the HPD report of the incident, it certainly does not prove Christian's assessment of shots fired. Christian's "back-up partner" theory is dubious at best, and certainly not sufficiently apparent from the record to demonstrate that trial counsel's representation was constitutionally deficient. Rather, it speaks to the many months that Christian has had to engage in hindsight theorizing.

**b. Pizza Hut and Marathon Robberies**

As with the Malicious Assault charge, Christian asserts that he is actually innocent of both armed robberies and argues that trial counsel failed to adequately investigate and discover exculpatory evidence on either robbery charge. (ECF Nos. 40 at 45; 57 at 30). Christian maintains that he never admitted to trial counsel that he robbed the Pizza Hut or the Marathon station. (ECF No. 57 at 31). Instead, he alleges that he provided counsel with multiple leads and other information that, but for trial counsel's failure to pursue further, would have demonstrated that another individual committed the robberies. (ECF No. 40 at 45, 50). After reviewing the relevant evidence

and testimony, the state habeas court found that trial counsel did not render ineffective assistance for failure to investigate statements and evidence relating to the robberies, "especially in light of Petitioner's statement that he had committed the crimes alleged." (ECF No. 39 at 34). As discussed below, this finding was not unreasonable or contrary to federal law.

Christian expends substantial effort piecing together bits of fact and speculation to support his theory that Josh Deitz committed the armed robberies at Pizza Hut and the Marathon station. (ECF No. 40 at 47-48). While Christian couches his claim in terms of ineffective assistance of counsel, it is clear that he is attempting to re-litigate the merits of his case using hindsight analysis and information that was produced long after he pled guilty to the robberies. For instance, Christian offers two jail house affidavits and a letter allegedly written by Josh Deitz in 2007 which imply that Dietz committed at least one of the robberies for which Christian was convicted. (ECF No. 39-1 at 67-68). Christian also seems to believe that Michele Black conspired with Richard Adams to falsely accuse Christian of the robberies, based in part upon a vehicle registration inquiry that he conducted in 2009.[5] (ECF No. 40 at 49). Unfortunately for Christian, the Court is "not at liberty to rely on hindsight to reconstruct the circumstances of counsel's conduct." *Winston v. Pearson ("Winston II")*, 683 F.3d 489, 504 (4th Cir. 2012). Rather, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at

---

[5] The motor vehicle inquiry indicates that the car Richard Adams confessed to using to drive Christian to the robberies, had previously been registered to "Jonathan R Lawson or Michele L Black." (ECF No. 39-2 at 13).

689. Accordingly, "the reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error." *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

During the state habeas proceedings, Christian "vigorously contested that he had ever admitted the robberies to his counsel." (ECF No. 40 at 50). However, after hearing the testimony and reviewing the evidence, the state habeas court credited trial counsel's testimony to the contrary. (ECF No. 39 at 34). Included in trial counsel's interview notes is a statement that "Greg admits he committed the armed robberies at Pizza Hut and Marathon." (ECF No. 39-2 at 35). Immediately below is another statement that "Rick Adams had nothing to do with the robberies." (*Id.*). During the omnibus hearing, Christian questioned trial counsel extensively as to whether that note was "indicative of what [he] may have told the police and not [him] actually making an admission of guilt to [counsel]." (ECF No. 54-7 at 26). Counsel responded several times that his notes were taken contemporaneously with Christian's direct statements to counsel, and therefore represented Christian's actual admissions to counsel, rather than a recitation of what Christian had previously told the police. (*Id.*). Aside from his own denial of admission, Christian offers no evidence to refute trial counsel's testimony that Christian told him he had committed the Pizza Hut and Marathon robberies. Accordingly, the state habeas court's factual determination that Christian admitted to counsel that he committed the Pizza Hut and Marathon station robberies was reasonable in light of the supporting evidence.

Despite his admission of guilt, Christian alleges that on or about June 26, 2002, he informed counsel that a friend of the Marathon robbery victim had told him that the victim did not recognize Christian as the person who had robbed him, and instead

believed "that the actual perpetrator of the robbery had a tattoo on his neck, was thought to be from the neighborhood, had blonde hair. . . [was] nicknamed 'Doe Hunt,' his real name was possibly Richard Bailey, and this information was given to the police." (ECF No. 40 at 45). Christian faults trial counsel for failing to follow up with this information, but the record reflects that during Christian's preliminary hearings, trial counsel specifically inquired as to whether a Mr. Bailey was under investigation for either of the robberies, and whether witnesses gave a suspect description of a man with blond hair. [6]  (ECF No. 54-6 at 41, 61). In response, Officer Johnson denied being aware of any investigation of a man named Mr. Bailey and could not recall if the suspect description included blonde hair. (*Id.* at 41, 61-62). Instead, Officer Johnson testified that Richard Adams had confessed to driving Christian to both robbery sites, waiting in the car until Christian returned, and then driving away with Christian after his announcement that he had just robbed the site. (*Id.* at 43-44, 56, 62).[7] Furthermore, during the omnibus hearing, counsel explained that he did not contact or interview either of the alleged robbery victims because Christian had admitted to committing both robberies. (ECF No. 54-8 at 7).

Christian further alleges that in or around November 2002, he (1) showed counsel an arrest warrant for Josh Deitz and Michele Black in connection with the armed robbery of Cricket's; (2) informed counsel that Cricket's is located within 10

---

[6] At the omnibus hearing, trial counsel did not recall such a conversation taking place. (ECF No. 54-7 at 27). However, police records relating to the Marathon robbery indicate that "a Dorothy Bailey called in and advised that PD went thru her res[idence] and questioned them/she saw news and thinks possibly a JC Wooten is the suspect fits description." (ECF No. 39-2 at 33).

[7] Officer Johnson also testified that Tammy Maynard was aware that Christian and Richard Adams had robbed the Pizza Hut "because after the Pizza Hut armed robbery they actually came back, gave her some [money] from that armed robbery to go buy beer and cigarettes, and then they sat around and watched the eleven o'clock news to see if it was going to be on television." (ECF No. 54-6 at 55). However, the taped interview transcripts seem to indicate that Richard Adams actually made these statements, (ECF No. 54-5 at 37-38), whereas Tammy Maynard denied any specific knowledge of either robbery. (ECF No. 54-5 at 86).

blocks of the Pizza Hut and Marathon station that were robbed; (3) informed counsel that, like Christian, Josh Deitz also has a tattoo on his neck, and therefore matched the description of the Pizza Hut suspect; (4) told counsel that Michele Black conspired with Josh Deitz in the Cricket's robbery; and (5) informed counsel that Josh Deitz was presently incarcerated. (ECF No. 40 at 47). During that same visit, Christian also told counsel that on June 3, 2002, the date of the Pizza Hut robbery, he "overheard Richard Adams state that he had recently spoken to Michele Black, and that Adams planned to go party with her boyfriend Josh," but that Christian himself was not on friendly terms with Michele Black. (*Id.*). Finally, Christian alleges that on or about December 15, 2002, he informed counsel that Michele Black was the very same Super America gas station employee whom the police interviewed shortly after the Pizza Hut robbery, and who had named Christian as a possible suspect in the robbery after police told her that the suspect had a neck tattoo. (ECF No. 39-2 at 29, 40 at 48).

According to Christian, this information should have put trial counsel on notice to investigate Josh Deitz as an alternate suspect in both robberies. Christian alleges that trial counsel provided ineffective assistance for failing to interview Josh Deitz, Michele Black, Tammy Maynard and Richard Adams. (ECF No. 40 at 48). He also assigns error to counsel for failing to "check the license plate or registration of the suspect vehicle, even though the plate number was provided to him in discovery." (*Id.*). In contrast, during the omnibus hearing, trial counsel explained to Christian that "based on you telling me that you had done the particular robberies, no I had not interviewed the witnesses." (ECF No. 54-7 at 23). Later, trial counsel elaborated that, "As I said, I talked to you, you advised me that you had committed the robberies, we talked about some of the issues regarding the shooting of Officer Combs, we were in

plea negotiations at that time, and again, as I previously explained, once you admitted to me that you had done the robberies I could not call witnesses to say you didn't; however, I would fully cross-examine any state witnesses because, again, they have the burden of proving you guilty, and if they weren't credible then the jury would find what it sees fit." (*Id.* at 37). In response to Christian's inquiry as to why trial counsel had not interviewed Tammy Maynard as a potential alibi witness to the Marathon robbery, counsel testified that "I remember you telling me about what happened at the residence regarding the shooting. I never recall you telling me that she could testify that you weren't at the scene. And after you told me you did it, I couldn't have called her anyway." (*Id.* at 41).

Contrary to Christian's belief, the revelation that Michele Black and Josh Deitz had apparently been involved in an unrelated robbery operation somewhat close in time and location to the Pizza Hut and Marathon robberies, did not create a duty for trial counsel to investigate whether Josh Deitz had actually committed the robberies, particularly in light of Christian's personal admission of guilt to counsel. Although Christian claims that Josh Deitz's physical characteristics matched the suspect description for both robberies, this would not necessarily have warranted further investigation by trial counsel, as Richard Adams had specifically identified Christian as the perpetrator of both robberies in the course of confessing his own involvement in the offenses.[8]  Even if counsel had reason to question the veracity of Richard Adams's statements to the police, Christian has offered no explanation as to why counsel should have questioned Richard Adams's ownership of the vehicle, particularly as the police

---

[8] Although trial counsel was not provided with Richard Adams' police interview transcripts, he was aware of this confession, because Officer Johnson testified at the preliminary hearing that Richard Adams had admitted to driving Christian to both armed robberies. (ECF No. 54-6 at 38).

sketch of Tammy Maynard's residence demonstrates that the vehicle was parked outside of her home the night of the shooting. (ECF No. 39-2 at 30). Certainly, the state habeas court's determination that trial counsel's investigation was not constitutionally deficient is neither unreasonable nor contrary to federal law.

### 3.  Failure to File Viable Motions

Christian argues that trial counsel was ineffective for failing to file several viable pre-trial motions, despite his repeated requests for counsel to do so. Specifically, Christian alleges that counsel should have filed: Motions to Suppress various incriminating evidence, including statements Christian made to the police, the results of a photo lineup, and items recovered from an illegal search and seizure. (ECF No. 40 at 31-35, 37-38); Motions to Compel State disclosure of certain evidence, including statements made by Richard Adams and Tammy Maynard, as well as surveillance footage from the gas station Christian allegedly robbed. (*Id.* at 41-45); a Motion for Change of Venue (*Id.* at 36); and a Motion to be moved to an alternative jail pending trial. (*Id.* at 38-40). "The choice and litigation of pre-trial motions in a criminal case are strategic and tactical decisions which should be made by defense counsel after consultation with the client." *Dumas v. United States*, Case No. 5:07-cv-00795, 2009 WL 1073697, at *9 (S.D.W.V. Feb. 3, 2009). Furthermore, these "[s]trategic decisions are insulated from challenge for ineffective assistance." *Flippo v. McBride*, 393 Fed. Appx. 93, 99 (4th Cir. 2010).

During the omnibus hearing, trial counsel described the strategic rationale that guided his decision not to file the various pre-trial motions that Christian requested:

> CHRISTIAN: Did you file a motion to suppress my statement prior to advising me to plead guilty?

COUNSEL:   That would have been filed had negotiations broken down if you had just said, no, I'm not going to plead to anything, of course, I would have filed that. But during the time where we were negotiating with the state I felt it best to keep that open; because if we had hearings on key matters and we lost, that gives us with the state a little better posture on the type of plea negotiations.

CHRISTIAN: Did I not repeatedly ask you to file motions to suppress my statements?

COUNSEL:   And I would have filed those, sir, if it were before the trial.

CHRISTIAN: But the agreement you reached with the state was five days before my trial date; correct?

COUNSEL:   Yes, sir.

CHRISTIAN: There was no motions filed up to that point in time, about a year, 14 months later?

COUNSEL:   No, sir. Each judge is different on the way they prefer motions to be filed. Some judges set us cutoff dates that may be months ahead of time. My experience in this particular court with that particular judge was he preferred to do the hearings at the last, you know, a couple of days before trial, so that's why we had not had the hearings yet.

CHRISTIAN: So waiting a year or so after the time of arrest would have been appropriate, from your standpoint?

COUNSEL:   Yeah, it wouldn't have affected what we would have argued.

(ECF No. 54-7 at 23). Christian himself read the contents of a letter dated November 4, 2002, in which trial counsel informed the prosecutor that he "would need to discuss with [the prosecutor] several motions that [counsel] will need to file should this matter appear that it is heading for trial," and that "there are some issues regarding the interrogation of [Christian]" that counsel wished to discuss with the prosecutor "prior to filing these motions with the court." (*Id.* at 32). Trial counsel affirmed his statements in the letter and reiterated that, "I had the motions that would have been filed. The particular court we were in the judge I was before prefers to hear those later,

and for tactical reasons I thought it was in your best interest that, you are directing me to work out a plea, that we withhold filing those until it was clear negotiations had broken down." (*Id.* at 32-33). Trial counsel reiterated this rationale with respect to the Motion to Suppress the photo lineup results, the Motion to Suppress the items seized during the search, and the Motion for Change of Venue. (ECF Nos. 54-7 at 44; 54-8 at 3, 5).

With respect to the Motion for Speedy Trial, trial counsel testified that "I recall that the reason we did delay this is, and you and I discussed it, is that we wanted to first determine what your federal sentence would be. You know, it's like pleading blind if you don't know what you're facing, it's very difficult and not in your best interest. So, yes, we discussed delaying this to determine specifically what your . . . federal time would be, because you're right, it was up in the air and we weren't sure." (ECF No. 54-7 at 35).

Regarding the statements of Richard Adams and Tammy Maynard, trial counsel explained during the omnibus hearing that "if they had been exculpatory, of course the state had to give those to us. But the general rule is they don't, even though we request sometimes, give us witness statements ahead of time unless they would be exculpatory or favorable in nature." (ECF No. 54-8 at 5).[9] The state habeas court found that "the only evidence that there exists exculpatory statements and witnesses is Petitioner's self-serving statements that there is evidence out there that exonerates him." (ECF No. 39 at 33). Based upon a review of the statements made by Richard Adams and Tammy Maynard this determination was not unreasonable. (ECF No. 54-5 at 2-87). Counsel's failure to make a futile motion cannot be the basis of an ineffective assistance claim.

---

[9] *See State v. Audia*, 171 W.Va. 568, 578-79 (W.Va. 1983) (rejecting defendant's claim that he was entitled to police records and statements made by certain witnesses to investigative officers).

*See Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005); *see also Lockhart v. Fretwell*, 506 U.S. 364, 382, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) ("[I]neffective-assistance claims predicated on failure to make wholly frivolous or unethical arguments will generally be dispensed with under *Strickland*'s first prong. . .").

Trial counsel did not recall Christian's request to file a Motion to Compel Production of the Marathon video. (ECF No. 54-8 at 3). However, during Christian's preliminary hearing, HPD Sergeant Johnson testified that although they had retrieved the Marathon surveillance video, it was not operating properly, and so there was nothing on it. (ECF No. 54-6 at 60). Counsel's purported failure to file a motion to compel production of an apparently inconsequential surveillance tape does not strike the undersigned as falling "below an objective standard of reasonableness," *Hill v. Lockhart*, 474 U.S. 52, 57-59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), and it certainly was not unreasonable for the state habeas court to conclude the same.

As for the Motion to be moved from Cabell County Jail, Christian claims to have informed counsel that "he had been beaten and assaulted on several occasions by Cabell County Jail correctional Officers; that the officers had made numerous verbal threats against his life; and that the officers had confiscated his commissary and legal materials for no reason." (ECF No. 40 at 38). However, Christian offers no evidence in support of these claims beyond his own assertions. In contrast, trial counsel testified that "[t]he only recollection I have was in an initial meeting where you said during the time of your, you told me clearly during the time of your interrogation that you had been beaten and they talked about you better find God and about Joe Combs' brother and that you felt threatened and that you were abused, but not any time after that." (ECF No. 54-8 at 4). Moreover, Christian does not attempt to explain the prejudice

that resulted from counsel's failure to file a motion to be moved from Cabell County Jail. To the extent Christian alleges his guilty plea was involuntary as a result of the alleged pretrial conditions of confinement, this argument is addressed below. *See infra* Part IV.C.4.

Based upon the record before the Court, the determination by the state habeas court, that "when pretrial motions would be filed is a matter of strategy and tactic, and counsel acted in accordance with local custom of the courtroom in which he was practicing," (ECF No. 39 at 34), was not unreasonable or contrary to federal law.

### 4. Applicability of the Recidivist Laws

Christian alleges that trial counsel rendered ineffective assistance by misadvising him regarding the applicability of the state recidivist laws. (ECF No. 40 at 53). Christian argues that he "specifically relied upon counsel's erroneous advice when he made the decision to plead guilty," and, therefore, he received ineffective assistance of counsel. (ECF No. 57 at 30).

To succeed on an ineffective assistance of counsel claim in the plea context, a petitioner must show that (1) counsel's performance was constitutionally deficient, and (2) "there is a reasonable probability that but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 58. Although "an attorney's reasonable professional judgment is given a heavy measure of deference," there is nevertheless "a difference between a bad prediction within an accurate description of the law and gross misinformation about the law itself." *United States v. Lewis*, 477 Fed. Appx. 79, 82 (4th Cir. 2012) (internal quotations omitted). Accordingly, "gross misadvice" regarding a defendant's potential sentencing exposure may warrant a finding of ineffective assistance of counsel. *United States v. Merritt*,

102 Fed. Appx. 303, 307 (4th Cir. 2004); *see Strader v. Garrison*, 611 F.2d 61, 63 (4th Cir. 1979) (defendant pleaded guilty based upon counsel's misadvice that sentence would not affect his parole eligibility date, contrary to state regulations); *Hammond v. United States*, 528 F.2d 15, 18 (4th Cir. 1975) (defendant pleaded guilty based upon counsel's misadvice that "he could be sentenced to at least 35 and perhaps 40 more years than the law would allow.").

In evaluating counsel's performance under the first prong of *Strickland*, "we cannot expect criminal defense lawyers to be seers, but we must demand that they at least apprise themselves of the applicable law and provide their clients with a reasonably accurate description of it." *Ostrander v. Green*, 46 F.3d 347, 355 (4th Cir. 1995), overruled on other grounds by *O'Dell v. Netherland*, 95 F.3d 1214 (4th Cir. 1996). Thus, "[w]hen representing a criminal client, the obligation to conduct an adequate investigation will often include verifying the status of the client's criminal record, and the failure to do so may support a finding of ineffective assistance of counsel." *United States v. Russell*, 221 F.3d 615, 621 (4th Cir. 2000) (citing *Tolliver v. United States*, 563 F.2d 1117, 1120-21 (4th Cir. 2007)).

The Fourth Circuit recently held in *United States v. Lewis,* that a defendant had received ineffective assistance "when he entered his guilty plea because his attorneys misadvised him that he qualified for a career offender sentencing enhancement and a mandatory life sentence." 477 Fed. Appx. at 81. There, the defendant had several prior state convictions that were classified as felonies under Ohio law, but were not punishable by more than one year imprisonment, and therefore did not count as qualifying underlying felonies for purposes of either a career offender enhancement or a mandatory life sentence. *Id.* at 82. This decision is consistent with other Fourth

Circuit decisions finding ineffective assistance based upon counsel's failure to appropriately verify the status of a defendant's prior convictions. *See Tolliver*, 563 F.2d at 1120-21 (4th Cir. 1977) (defendant pleaded guilty based upon counsel's misadvice that he would receive an enhanced sentence because of his prior record, when the prior convictions were actually invalid); *United States v. Breckenridge*, 93 F.3d 132, 138 (4th Cir. 1996) (defendant received a career offender enhancement due to counsel's failure to argue at sentencing that defendant's underlying convictions were "related."); *United States v. Russell*, 221 F.3d 615, 621 (4th Cir. 2000) (counsel failed to verify defendant's criminal history, resulting in the prosecutor's prejudicial use of two vacated convictions to impeach defendant's testimony).

In the instant case, Christian alleges that on September 2, 2003, the date of his plea hearing, he decided that he only wanted to plead guilty to the malicious assault charge, contrary to the terms of the plea agreement that had previously been negotiated. (ECF No. 40 at 53). According to Christian, counsel then informed him "that the State would seek to enhance his sentence under the recidivist statute if he persisted" with pleading only to the malicious assault charge. (*Id.*).[10] Although counsel apparently "did not specify as to what statute that the Prosecution intended to proceed under," (ECF No. 39-1 at 59), Christian interpreted this to mean that he would be subject to a mandatory life sentence. (ECF No. 39 at 53). Christian alleges that as a result of counsel's warning, he chose to plead guilty to all three charges in accordance with the plea agreement. (ECF No. 57 at 29).

---

[10] Under the West Virginia recidivist statute, a criminal defendant who has previously been convicted of a felony punishable by imprisonment may be subject to an additional 5 year sentence, or in the case of an indeterminate sentence, the minimum term of years will be doubled. W.V. Code § 61-11-18(a). In the case of an individual convicted of two prior offenses punishable by imprisonment, "the person shall be sentenced to be confined in the state correctional facility for life." W.V. Code § 61-11-18(c).

Christian now argues that he actually did not qualify for a life sentence under the state's recidivist laws. (ECF No. 40 at 55). Christian concedes that he "had previously advised his counsel that he had two prior felonies, without any further detail" but asserts that counsel should have made "additional inquiries into the circumstances of [his] prior felonies" to determine if they counted as qualifying offenses for the purpose of the state recidivist enhancement. (*Id.* at 53). Christian argues that had trial counsel verified Christian's criminal history, he would have discovered that because the two prior felonies were listed in a single indictment and his conviction of both occurred on the same day, they only constituted one felony for the purpose of the recidivist enhancement. (ECF No. 60 at 9-10).[11] Christian argues that he "specifically relied upon counsel's erroneous advice when he made the decision to plead guilty," and that he therefore received ineffective assistance of counsel. (ECF No. 57 at 30). For the foregoing reasons, however, the Court is satisfied that Christian did not receive ineffective assistance of counsel.

First, although Christian faults counsel for his belief that he qualified for a life sentence under the recidivist laws, Christian only alleges that counsel warned him "that the State would seek to enhance his sentence under the recidivist statute if he persisted" in pleading contrary to the plea agreement. (ECF No. 40 at 53). Based upon Christian's own admission to having "been previously convicted of two prior felonies" over ten years prior, however, it seems that he would have qualified for a recidivist enhancement, if not a life sentence, under W.V. § 61-11-18(a). (ECF No. 39-1 at 59).

---

[11] The Supreme Court of Appeals of West Virginia confirmed in *State v. Boles,* 149 W.Va. 779, 780-81, 143 S.E.2d 467 (1965), that two separate felony convictions returned on the same day are "considered only as a single felony within the meaning of the recidivist statute." *See also* State *v. Stover,* 179 W.Va. 338, 339 (W.Va. 1988) ("where two convictions are obtained against the defendant on the same day, they are treated as one conviction and neither can be used to enhance the other" under the recidivist statute") (citing *Turner v. Holland,* 175 W.Va. 202, 203 (W.Va. 1985)).

There is no evidence that counsel's prediction that the State would pursue a recidivist enhancement was misguided or incorrect, particularly in light of the fact that one of the stipulated terms of the previously negotiated plea agreement had been that the State would not pursue a recidivist enhancement. (ECF No. 54-9 at 11). In fact, in his original pleadings to the state habeas trial court, Christian himself alleges that "the Prosecutor threatened that he would pursue recidivist proceedings against Petitioner ... if he elected to plead to only [the malicious assault charge], rather than all counts." (ECF No. 39-1 at 21).

Second, it appears that Christian was eligible for a life sentence recidivist enhancement, contrary to his belief. Under the state recidivist statute, when it is determined that a criminal defendant has "been twice before convicted in the United States of a crime punishable by confinement in a penitentiary, the person shall be sentenced to be confined in the state correctional facility for life." W.V. Code § 61-11-18(c). In addition to the qualifying conviction addressed above, on May 28, 2003, Christian pled guilty and was convicted of Knowingly Possessing an Unregistered Destructive Device and Possession of a Firearm by a Convicted Felon. He was sentenced to 63 months imprisonment on the two charges. (*See* S.D.W.V. Case No. 3:02-cr-00202 at ECF No. 49 at 1-2).[12] (*Id.*). Christian's federal conviction was clearly known to both the state prosecutor and trial counsel at the time of Christian's plea hearing. During Christian's plea hearing, the prosecutor informed the court that Christian was presently serving a federal sentence for "felony possession and Molotov

---

[12] The indictment in the federal proceeding was returned on September 10, 2002. The indictment indicated that Christian had been convicted of ***three*** prior felonies, two on March 5, 1990 and one on September 21, 1988. According to the indictment, Christian was convicted in the Circuit Court of Cabell County in 1988 of grand larceny and in 1990 of grand larceny and burglary. If this information is accurate, Christian qualified for the life sentence recidivist enhancement even without his federal conviction.

cocktail." (ECF No. 54-6 at 71). Trial counsel was also apparently aware of Christian's federal conviction, as he testified during the omnibus hearing to having conversations with Christian's federal defense attorney. (ECF No. 54-7 at 34). Although the West Virginia Supreme Court of Appeals has never explicitly endorsed the use of prior federal convictions to enhance a sentence, the "recidivist statute states in unambiguous terms, that it applies whenever such person had been before convicted of a crime punishable by imprisonment in a penitentiary." *State v. Williams*, 196 W.Va. 639, 643 (W. Va. 1996) (internal quotations omitted); *see also State ex rel. Chadwell v. Duncil*, 196 W.Va. 643, 647 (W. Va. 1996) ("[T]he terms of our recidivist statute are not ambiguous and must be given full force and effect."). As the West Virginia Supreme Court has held, the purpose of the recidivist statute is "to deter those who have been convicted of felonies from committing subsequent offenses." *State v. Stover*, 179 W.Va. 338, 368 (W. Va. 1988). The Court sees no principled difference between a federal felony and a state felony that would preclude the State from pursuing a recidivist enhancement on the basis of a qualifying underlying federal conviction. Moreover, in *Butler v. Hoke*, Case No. 11-0866, 2012 WL 3091082, at *2 (W.Va. May 29, 2012), the West Virginia Supreme Court acknowledged that convictions for crimes in other jurisdictions could be used to trigger West Virginia's recidivist statute. The Court stated "[w]hether the conviction of a crime outside of West Virginia may be the basis for application of the West Virginia Habitual Criminal Statute, *W. Va.Code* [§ ] 61–11–18–19 [1943], depends upon the classification of that crime in this State." Syl. Pt. 3, *Justice v. Hedrick,* 177 W.Va. 53, 350 S.E.2d 565 (1986). Thus, Christian's federal conviction of being a felon in possession of a firearm would constitute a predicate felony under West Virginia's recidivist statute as the crime is classified as a felony

under West Virginia law. *See* West Virginia Code § 61-7-7(b)(1) (possession of a firearm by a person who has previously been convicted of a felony crime of violence is a felony punishable by a term of imprisonment up to five years).[13]

Even assuming Christian's assertion that counsel erred in failing to determine whether his two state felony convictions qualified as one underlying conviction for recidivist enhancement purposes, "the risk that the petitioner could have been treated as a recidivist under the statute was real," as was the risk that State would have pursued a life sentence. *Harrison v. McCall*, Case No. 08-3364-HFF-PJG, 2009 WL 2901628, at *9 (D.S.C. Sept. 10, 2009). Consequently, the undersigned agrees with the state habeas court's determination that Christian failed to demonstrate constitutionally deficient assistance and prejudice regarding his sentencing exposure.

### 5. Collective Impact of Counsel's Errors

Christian argues that "the errors listed above when amassed together results in an egregious case of ineffective assistance of counsel." (ECF No. 40 at 62). However, the Fourth Circuit has consistently held that "ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively." *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998); *Mueller v. Angelone*, 181 F.3d 557, 586 n.22 (4th Cir. 1999); *Rocheville v. Moore*, Case No. 98-23, 1999 WL 140668 at *6 n.6 (Mar. 16, 1999); *Drayton v. Moore*, 168 F.3d 481, 1999 WL 10073, at *3 (4th Cir. Jan. 12, 1999). As such, "it is not appropriate to consider the cumulative effect of attorney error when the individual claims of ineffective assistance do not violate the defendant's constitutional rights." *United States v. Russell*, 34 Fed. Appx. 927, 927

---

[13] Under West Virginia law, burglary is considered a crime of violence. *See State v. Evans,* 203 W.Va. 446, 450, 508 S.E.2d 606 (1998). Therefore, Christian's 1990 felony conviction for burglary would result in a felony classification for his firearm possession.

(4th Cir. 2002). On the other hand, when it is determined that counsel's performance was deficient, the Court will examine whether the cumulative effect of counsel's errors prejudiced the defendant. *Id.* at 928; *see also Huffington v. Nuh*, 140 F.3d 572, 583 (4th Cir. 1998) ("Viewing the evidence as a whole, including any errors, our confidence in the outcome of the trial remains undisturbed.").

In Christian's case, the state habeas court found that "in light of all the circumstances, the identified acts or omissions of trial counsel in his representation of Petitioner were not outside the wide range of professionally competent assistance." (ECF No. 39 at 34). As discussed above, this determination was neither unreasonable nor contrary to established federal law relating to ineffective assistance of counsel. Christian, having failed to demonstrate that trial counsel's performance was constitutionally deficient with respect to his individual claims, cannot demonstrate that the cumulative effect of counsel's errors deprived him of effective assistance of counsel. *See Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) (holding that attorney "[e]rrors that are not unconstitutional individually cannot be added together to create a constitutional violation"), cited in *Fisher*, 163 F.3d at 853.

After thoroughly considered the matter, the undersigned **FINDS** that the state courts' determination that Christian failed to establish ineffective assistance of counsel was not an objectively unreasonable application of, nor contrary to, clearly established federal law. Likewise, the state courts' findings were not based upon an unreasonable determination of the facts in light of the evidence submitted in the state court proceeding. Accordingly, Respondent is entitled to summary judgment on this ground.

### B. Brady Claims

Christian argues that the State withheld exculpatory and impeachment evidence in violation of *Brady v. Maryland*. (ECF No. 40 at 75). Specifically, Christian alleges that the State failed to provide: (1) the Marathon station video surveillance tape; (2) the ballistics laboratory test results; (3) Richard Adams' transcribed statements to the police; (4) Tammy Maynard's transcribed statements to the police; (5) various photographs and sketches depicting the shooting scene; (6) arrest information regarding Joshua Deitz and Michele Black; (7) the fact that the get-away car used in the robberies was registered to Michele Black; and (8) the 9-1-1 CAD (Computer Aided Dispatch) logs which included statements made by the witnesses of the Pizza Hut and Marathon station robberies. (ECF No. 39-1 at 20-21). Christian asserts that the State's withholding violated his Due Process rights, and that as a result, his guilty plea was unintelligent and involuntary. (ECF No. 40 at 75). The state habeas court found that Christian "failed to establish any particular evidence was allegedly suppressed or not disclosed by law enforcement" and also "failed to establish by a preponderance of the evidence that the prosecutor's office failed to disclose or suppressed any evidence." (ECF No. 39 at 27). The undersigned endorses the state court's determination.

Pursuant to *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Furthermore, "evidence that can be used to impeach a witness is unquestionably subject to disclosure under *Brady*." *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547, 556 (4th Cir. 1999) (citing *United States v. Bagley,* 473 U.S.

667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). However, the *Brady* right to exculpatory evidence does not "equate to a right to rummage through governmental files." *Kasi v. Angelone*, 300 F.3d 487, 504 (4th Cir. 2002). Thus, the "mere possibility that an item of undisclosed information might have helped the defense . . . does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109-110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Rather, to establish a so-called *Brady* violation, the defendant must demonstrate that (1) the evidence at issue is favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice ensued as a result of the suppression. *Wolfe v. Clarke*, 691 F.3d 410, 420 (4th Cir. 2012); *Spicer*, 194 F.3d at 555; *see also Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

As the Fourth Circuit has held, the *Brady* right "is a *trial* right," in that it "exists to preserve the fairness of a trial verdict and to minimize the chance that an innocent person would be found guilty." *United States v. Moussaoui*, 591 F.3d 263, 285 (4th Cir. 2010). In contrast, "[t]he guilty plea context does not present the same fairness concerns because the defendant's guilt is admitted*." United States v. Gordon*, Case No. 3:04-cr-0023-001, 2010 WL 4974567, at *4 (W.D.Va. Dec. 2, 2010); *see Moussaoui*, 591 F.3d at 286 (discussing *United States v. Ruiz*, 536 U.S. 622, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002)). Christian cites several court opinions from within the Fourth Circuit in support of his claim that the State's withholding of evidence invalidated his plea agreement. (ECF No. 57-1 at 14, citing *United States v. McCleary*, 1997 WL 215525, at *3 (4th Cir. 1997); *Banks v. United States*, 920 F.Supp. 688, 692 (E.D.Va. 1996)). However, both *McCleary* and *Banks* predate the Supreme Court's holding in

*Ruiz,* that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *Ruiz*, 536 U.S. at 633. The Supreme Court has not ruled on "whether the *Brady* right to *exculpatory* information, in contrast to *impeachment* information, might be extended to the guilty plea context." *Massaoui*, 591 F.3d at 286 (emphasis in original). Although the Fourth Circuit has suggested *in dicta* that *Ruiz* foreclosed the *Brady* right to exculpatory information prior to a guilty plea, *Jones v. Cooper*, 311 F.3d 306, 315 n.5 (4th Cir. 2002), the court has subsequently declined to resolve the issue conclusively. *Massaoui*, 591 F.3d at 286.

In Christian's case, the transcribed statements of Richard Adams and Tammy Maynard are not exculpatory. Richard Adams initially denied his own involvement in the robberies, but subsequently admitted to participating in both the Marathon station and Pizza Hut robberies, and in doing so, implicated Christian. (ECF No. 54-5 at 2-44). His transcript was therefore not valuable for its exculpatory content, but may have been useful for impeachment purposes, had Richard Adams testified against Christian. [14] Likewise, Tammy Maynard initially denied her knowledge that Christian was in her home the night of the shooting, but subsequently admitted that she knew he had been in her home, that he had given her cash that evening for the "aggravation" of staying with her, and that she believed he knew he was shooting at police officers. (*Id.* at 46-87). Although Tammy Maynard claimed to have been unaware of Christian's involvement in robberies, she did not offer any alibi statements as to his whereabouts on either evening. (*Id.* at 86). Thus, the statements made by Richard Adams and

---

[14] It should also be noted that the prosecutor conceded in response to a discovery request for "prior false statements of state witnesses" that "the co-defendant [Richard Adams] and Tammy Maynard may have initially given false statements to law enforcement in this matter." (ECF No. 54-2 at 37, 43). Therefore, the State revealed the potential value of the statements for impeachment prior to Christian's guilty plea.

Tammy Maynard were not subject to disclosure, as Christian pleaded guilty instead going to trial. *See Ruiz*, 536 U.S. at 633.

Assuming *Brady* requires disclosure of exculpatory evidence in the guilty plea context, Christian has also failed to demonstrate that any of the remaining evidence was wrongfully withheld. Contrary to Christian's apparent belief, *Brady* does not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." *United States v. Bagley*, 473 U.S. 667, 677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (internal quotations omitted). Only exculpatory evidence that is *material* to a defendant's guilt or punishment is subject to *Brady* disclosure. Evidence is considered "material" if there is a "reasonable probability that the proceeding would have resulted in a different outcome had the evidence been disclosed to the defense." *Richardson v. Branker*, 668 F.3d 128, 145 (4th Cir. 2012) (citing *Strickler*, 527 U.S. at 280). When assessing a *Brady* claim, the relevant inquiry is "whether the favorable evidence withheld from the defendant reasonably could be considered as placing the entire case in such a different light that confidence in the verdict is undermined." *Id.*

With respect to the shooting, Christian alleges that the State withheld the ballistics laboratory test results and various photographs and sketches depicting the shooting scene. None of these items are sufficiently exculpatory to have placed Christian's case in such a different light as to undermine confidence in his conviction for Malicious Assault on a Police Officer. As discussed above, Christian's "back-up" partner theory appears to be largely rooted in speculation. *See supra* Part IV.A.2.a. Although the ballistics report could not "identify or eliminate" the bullet that shot Officer Combs as having been fired from Christian's .32 caliber S&W revolver, the

report did identify the bullet as a .32 caliber S&W lead bullet, (ECF No. 54-9 at 5), rather than a .40 caliber HPD bullet. As for the crime scene sketches, they merely depict the location of various spent casings, slugs, and bullet trajectories, (ECF No. 54-3 at 12-15), and at any rate the State specifically listed the sketches in its answer to Christian's discovery request, with instructions to "please make arrangements with Detective Chris Sperry to view" them. (ECF No. 54-2 at 41-42).

       As for the armed robberies, Christian alleges that the State withheld the Marathon station video surveillance tape, certain information relating to Joshua Deitz and Michele Black, and the 9-1-1 CAD logs of statements provided by the witnesses of the two armed robberies. (ECF No. 39-1 at 20-21). Although Christian claims that the Marathon surveillance tape "would have conclusively shown who actually robbed the establishment," (*Id.* at 20), there is no evidence on the record to support this assertion. Instead, during Christian's preliminary hearing, Sergeant Johnson testified that they had recovered a tape, but the recording device was not operating properly and there was nothing on the tape. (ECF No. 54-6 at 60). Christian offers no evidence to the contrary beyond his own unsupported speculation. Similarly, although Christian has identified Joshua Deitz and Michele Black as "alternative suspects" in his own pleadings, it does not appear that the HPD considered them to be potential suspects in the Marathon and Pizza Hut robberies. (ECF No. 54-2 at 38, 44). Joshua Deitz and Michele Black were arrested for an unrelated armed robbery incident three months after Christian's arrest. Nothing contained in their arrest information exculpates Christian from the armed robberies to which he pled guilty. Although this information may have been useful for the purpose of impeaching Michele Black's testimony at trial, Christian instead entered a guilty plea, and as a result was not entitled to disclosure

under *Brady. See Ruiz*, 536 U.S. at 633. Christian's belief that the State withheld the fact that the get-away car used in the armed robberies had previously been registered to Michele Black is similarly misplaced, considering the vehicle itself was parked outside of Tammy Maynard's residence on the date of the shooting incident, and Richard Adams admitted to police that he owned the vehicle, although it was not legally registered to him. (ECF No. 54-5 at 15, 35, 41). Finally, Christian argues that the State failed to provide him with the 9-1-1 CAD logs from the Marathon and Pizza Hut robberies, which contain exculpating suspect information provided by the witnesses. (ECF No. 57-1 at 11-12). However, as with the crime scene sketches of the shooting, the State specifically listed the 9-1-1 tapes in its answer to Christian's discovery request, with instructions to "[p]lease make arrangements with Detective Christ Sperry to view" them. (ECF No. 54-2 at 41-42). Christian himself acknowledges as much in his pleadings. (ECF No. 57-1 at 12).

Christian has plainly failed to demonstrate any *Brady* violation with respect to the evidence he claims to have been denied. Therefore, the state habeas court did not err in finding that Christian failed to establish that the State withheld or suppressed evidence in violation of *Brady*.

### C. Involuntary Guilty Plea

Generally, a voluntary guilty plea acts as a complete admission of the material elements of the crime charged. *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). "By entering a plea of guilty, the accused is not simply stating that he did the discrete acts described in the indictment; he is admitting guilt of a substantive crime." *United States v. Broce,* 488 U.S. 563, 570, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). Consequently, "a guilty plea constitutes a waiver of all non-

jurisdictional defects ...  including 'the right to contest the factual merits of the charges.'" *United States v. Willis,* 992 F.2d 489, 490 (4th Cir. 1993), quoting *United States v. Freed*, 688 F.2d 24, 25 (6th Cir. 1982).  The sworn admissions and statements of the defendant made at the plea hearing "carry a presumption of verity" and "constitute a formidable barrier against any subsequent collateral proceedings." *Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977). Notwithstanding these principles, a criminal defendant's "plea of guilty is constitutionally valid only to the extent it is voluntary and intelligent." *Bousley v. United States*, 523 U.S. 614, 618, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). For that reason, once a criminal defendant has pled guilty, collateral review is largely limited to an examination of whether the plea was voluntary and intelligent. *Broce,* 488 U.S. at 569.

Christian raises several deficiencies with respect to his plea of guilty, which he alleges rendered his plea unknowing or involuntary. The Court addresses each claim in turn.

### 1. Advisement of Constitutional Rights Waived

Christian argues that the trial court conducted an inadequate plea colloquy with respect to the Constitutional rights he would be waiving, and as a result, his guilty plea was not knowing and voluntary. (ECF No. 40 at 76). Specifically, Christian alleges the trial court "only advised him that he would be waiving his right to a jury trial," but did not warn him that he would be waiving his rights to a "public and impartial trial." (*Id.*). The state habeas court rejected Christian's claim as lacking merit, and observed that "the trial court is not obligated to list every single right." (ECF No. 39 at 25).

Before accepting a guilty plea, the court must determine that the defendant is competent to enter the plea, and that his waiver of constitutional rights is knowing and voluntary. *Godinez v. Moran*, 509 U.S. 389, 400, 113 S. Ct. 2680, 125 L.Ed.2d 321 (1993). A defendant entering a plea of guilty "simultaneously waives several constitutional rights, including his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers." *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). Accordingly, the Court "cannot presume a waiver of these three important federal rights from a silent record." *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Instead, "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

In the instant case, the trial court engaged in the following plea colloquy with respect to Christian's waiver of constitutional rights:

> COURT:   I'll ask you if you understand that by entering these pleas here today you'll be waiving and giving up your constitutional and statutory rights, including your right to a jury trial, your right to appeal any errors of law that were made in the criminal justice process, and many other constitutional and statutory rights?
>
> CHRISTIAN: Yes, sir.
>
> COURT:   Do you now waive and give those rights up and ask this Court to continue to take your plea here today?
>
> CHRISTIAN: Yes, sir.

(ECF No. 54-6 at 72). The record also includes a six-page questionnaire of Questions Relative to Entry of Plea of Guilty, in which Christian acknowledged his right to a trial

by jury; the burden of the State to prove his guilt beyond a reasonable doubt, and to the satisfaction of a unanimous jury; the privilege against self-incrimination; the right to confront adverse witnesses and offer supporting witnesses; as well as various other trial rights relating to introducing and suppressing witness testimony and evidence. (ECF No. 54-9 at 17-18). Christian confirmed that he filled out the questionnaire with the help of his lawyer, (ECF No. 54-6 at 73),[15] and the trial court twice verified that Christian's answers in the questionnaire were true. Subsequently, Christian reviewed questionnaire and signed the bottom of each page under oath before the trial court. (*Id.* at 73-74).

As Christian readily admits, the trial court specifically confirmed Christian's understanding that he would be waiving his right to a jury trial. (ECF No. 40 at 76). Christian now claims that he did not realize that he was entitled to a "public and impartial trial" and that "these two rights would have been significant to him at the time." (*Id.*). This argument is patently incongruous in light of Christian's repeated assertions at the plea hearing that he had consulted with his attorney, that he understood the trial rights described in the questionnaire, and that he understood the constitutional rights he would be waiving by virtue of his guilty plea, including the right to a trial by jury. (ECF Nos. 54-6 at 72-74; 54-9 at 16-23). "There is no Supreme Court authority requiring a trial court judge to specifically detail each *Boykin* right being waived before a criminal defendant's guilty plea can be deemed constitutionally valid. Rather, the relevant inquiry is whether the circumstances surrounding the plea demonstrate that the defendant knowingly and voluntarily waived his rights in

---

[15] Although Christian asserts that counsel wrote down the answers instead of allowing Christian to do so himself, he does not deny reviewing the questionnaire with his attorney or signing each page under oath before the trial court. (ECF No. 40 at 76).

entering the plea." *Croll v. Phelps*, Case No. 11-214 (NLH), 2012 WL 946769, at *5 (D. Del. Mar. 19, 2012) (citing *United States v. Stewart,* 977 F.2d 81, 84–85 (3d Cir.1992); *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)). The state habeas court was not unreasonable in finding the trial court's plea colloquy to be adequate to insure that Christian entered a knowing and intelligent guilty plea.

### 2. Prosecutor's Prejudicial "Ex Parte" Statements

Christian alleges that on the morning of his plea hearing, the state prosecutor approached him outside of his counsel's presence regarding his change of heart as to the previously negotiated plea agreement. (ECF No. 40 at 78). According to Christian, the state prosecutor stated: "This is a shocker, are you sure you know what you're doing?" (*Id.*). Christian claims that he responded by asking for his attorney. (*Id.*). He now alleges that the prosecutor's statement caused him to plead guilty to all three charges, in accordance with the original plea agreement. (*Id.*). The state habeas court held that Christian was not prejudiced by the prosecutor's remarks because the statements were not heard by a jury. (ECF No. 39 at 34). The court additionally rejected Christian's claim that his guilty plea was involuntary. (*Id.* at 16, 25).

Christian cites *State v. Britton*, 157 W.Va. 711 (W. Va. 1974), a West Virginia Supreme Court of Appeals's opinion, in support of his claim that the prosecutor's actions were impermissible and rendered his guilty plea involuntary. (ECF No. 40 at 78). In *Britton*, the court cautioned that "a prosecutor should not counsel with an accused who is represented by his own attorney, in the absence of that attorney, concerning aspects of the pending prosecution against the accused." *Britton*, 157 W.Va. at 717. However, the court also acknowledged that "such conduct does not per se constitute reversible error in a criminal trial." *Id.* Although the court in *Britton*

ultimately reversed the defendant's conviction, Christian's case is significantly distinguishable. In *Britton*, the defendant engaged in a thirty minute conversation with the prosecutor at the prosecutor's private law office, during which the defendant outlined his trial strategy, named two prospective witnesses and the contents of their likely testimony, and attempted to negotiate a plea agreement, all outside of the knowledge and presence of the defendant's attorney. *Id.* at 714. The defendant was later convicted at trial, and in reversing the conviction, the State Supreme Court emphasized that "to have gained some knowledge from the accused in advance of trial—what witnesses the defendant would use in his basic defense to the charge—could have provided the prosecutor with a possible advantage to overcome the defense." *Id.* at 718. In contrast, Christian's exchange with the State prosecutor was extremely brief, he relayed no information to the prosecutor, and he chose to plead guilty, rather than try his case before a jury.

To the extent Christian argues that the prosecutor's statement caused him to plead guilty involuntarily, the Court relies on the following standard articulated by the Supreme Court of the United States:

> A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady v. United States*, 397 U.S. at 755. Thus, in order for a defendant such as Christian, who was fully aware of the direct consequences of his plea, to set aside the plea as involuntary, he must show that: "(1) some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government

agents) antedated the entry of his plea, and (2) the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice." *United States v. Fisher*, 711 F.3d 460, 465 (4th Cir. 2013) (quoting *Ferrara v. United States*, 456 F.3d 278, 290 (1st Cir. 2006)) (internal quotations omitted).

In Christian's case, the Court is not convinced that the prosecutor's alleged action constitutes "egregiously impermissible conduct." Christian takes issue with the fact that the prosecutor spoke to him outside the presence of his counsel. However, the prosecutor did not make any misrepresentations or unfulfillable promises to Christian. *Brady v. United States*, 397 U.S. at 755. Although Christian may have construed the prosecutor's statement as a threat to pursue an enhanced sentence, the Supreme Court has specifically declined to hold "that a guilty plea is coerced and invalid if influenced by the fear of a possibly higher penalty for the crime charged if a conviction is obtained after the State is put to its proof." *Id.* at 750-51. In any event, the prosecutor had previously made it clear that he would seek a recidivist enhancement if Christian was convicted at trial. Although Christian claims that this event "triggered a chain reaction" which led him to plead guilty, he does not explain how the fact that the prosecutor approached him outside the presence of counsel rendered his guilty plea involuntary, as opposed to the content of the prosecutor's remark.

Rather, it appears to the undersigned that Christian's decision to plead guilty was appropriately influenced by his concern that the State would pursue an enhanced sentence under the State's recidivist laws. Christian has acknowledged that his trial counsel independently advised him on the date of his plea hearing that the State would pursue a sentence enhancement if he chose to plead only to the malicious assault charge. (ECF No. 40 at 53). Furthermore, during the plea colloquy, the trial court

specifically asked:

> COURT:      I'll ask you, Mr. Christian, if anybody is forcing you to come here today and give up your rights or enter this plea?

> CHRISTIAN: No, sir.

> COURT:      Has anybody promised you anything other than the plea agreement to get you to do this?

> CHRISTIAN: No, sir.

> COURT:      Are you currently under the influence of any alcohol, drugs or any mental defect or disability?

> CHRISTIAN: No, sir.

(ECF No. 54-6 at 72-73). Likewise, the trial court asked counsel "if [he] believe[d] that [Christian was] under any coercion or under the influence of any alcohol, drugs or any mental defect or disability here today," to which counsel responded that he did not. (*Id.* at 75). Thus, even assuming the impermissibility of the prosecutor's conduct, Christian has not established that his guilty plea was entered involuntarily as a result of misconduct. *See also United States v. Guerra*, 401 Fed. Appx. 746, 748 (4th Cir. 2010) (concluding that the defendant's "self-serving statements [that a federal agent told him he would suffer consequences if he did not sign the plea agreement offered by the Government], even if accurate, do not rise to the level of clear and convincing proof that his plea was induced by coercion or intimidation").

### 3. Advisement on the Element of "Malice"

Christian argues that his guilty plea to the charge of Malicious Assault on a Police Officer is invalid because he was not properly advised of the "malice" element of the offense. (ECF No. 40 at 79). He alleges that when he entered his guilty plea, he was under the impression that "the finding of a firearm" satisfied the element of malice. (ECF No. 39-1 at 22). He contends that if someone had explained to him that the

elements of Unlawful Assault on a Police Officer also included the use of a firearm, he would only have considered a guilty plea to Unlawful Assault on a Police Officer, which carried a less severe penalty. (ECF No. 39-1 at 22-23). Christian asserts that he did not act with "malice" because he did not realize he was shooting at a police officer when he shot Officer Combs.[16]  (ECF No. 40 at 79). Therefore, his erroneous belief that the use of a firearm, in and of itself, constituted malice renders his guilty plea unknowing and involuntary.

A review of the record, however, demonstrates that Christian was properly charged with a malicious assault. The West Virginia Supreme Court of Appeals has defined malice as "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm," *State v. Davis*, 220 W.Va. 590, 594 (W. Va. 2007) (quoting *People v. Goecke*, 457 Mich. 442 (1998)); or "the intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstance that the law will imply an evil intent ... A condition of the mind showing a heart regardless of social duty and fatally bent on mischief." *State v. Williams*, 209 W.Va. 25, 31 (W. Va. 2000) (quoting *State v. Burgess*, 205 W.Va. 87, 90 (W. Va. 1999). Similarly, "malicious" has been defined as "substantially certain to cause injury and without just cause or excuse," *Clark v.*

---

[16] Under West Virginia law, Malicious Assault on a Police Officer occurs when a person "maliciously shoots, stabs, cuts or wounds or by any means causes bodily injury with intent to maim, disfigure, disable or kill a police officer . . . acting in his or her official capacity and the person committing the malicious assault *knows or has reason to know that the victim is a police officer*." W.V. Code § 61-2-10b(b) (2000). In contrast, Unlawful Assault on a Police Officer occurs when a person "unlawfully but not maliciously shoots, stabs, cuts or wounds or by any means causes a police  officer . . . acting in his or her official capacity, bodily injury with intent to maim, disfigure, disable or kill him or her and the person committing the unlawful assault *knows or has reason to know that the victim is a police officer*." W.V. Code § 61-2-10b(c) (2000) (emphasis added).Thus, Christian's argument that he should have been convicted of the lesser offense of Unlawful Assault on a Police Officer is nonsensical given that knowledge of the victim's position as a police officer is an element of both offenses.

*Druckman*, 218 W.Va. 427, 434 (W. Va. 2005) (internal quotations omitted); or "characterized by, or involving malice; having, or done with, wicked, evil or mischievous intentions or motives; wrongful and done intentionally without just cause or excuse or as a result of ill will." *Burgess*, 205 W.Va. at 89. The West Virginia Supreme Court has further cautioned that malice can include "not only anger, hatred and revenge, but other unjustifiable motives ... It may be inferred from any deliberate and cruel act done by the defendant without any reasonable provocation or excuse, however sudden." *State v. Bongalis*, 180 W.Va. 584, 588 (W. Va. 1989).

As a result, the West Virginia Supreme Court has long held that malicious intent may be inferred from the use of a deadly weapon to commit the charged offense. *State v. Ritchie*, 2012 WL 3079171, at *3 (W. Va. Apr. 13, 2012) (finding no error where jury instructions on malicious assault permit inference of malice from use of a deadly weapon); *State v. Lewis*, 207 W.Va. 544, 551 (W. Va. 2000) (same); *State v. Currey*, 133 W.Va. 676, 686 (W.Va. 1950) ("[M]alicious or unlawful intent may be inferred from the unexplained wounding of a person with a deadly weapon."); *see also State v. Hamric*, 151 W.Va. 1, 18 (W. V. 1966); *State v. Boggs*, 129 W.V. 603, 613 (W. Va. 1946) (citing *State v. Shelton*, 116 W.V. 75, 178 S.E. 633, 636 (W. Va. 1935)).

The state habeas court rejected Christian's claim that his guilty plea was involuntary and unintelligent with respect to the element of maliciousness. The state habeas court observed that "in entering his plea, Petitioner recited facts that formed the basis of the crimes alleged" and that "the trial court held a reconsideration hearing December 2003 at which hearing it was determined that the finding of a firearm was consistent with Petitioner's understanding of the plea." (ECF No. 39 at 36). Christian claims he was not advised of the element of "malice," but the only evidence he offers in

support of this claim is premised on an incorrect interpretation of the law. To the contrary, Christian admits that at the time he entered his guilty plea, he understood that he satisfied the element of "malice" due to the finding of a firearm and the events surrounding the shooting. [17]  (ECF No. 39-1 at 22). Even assuming Christian's assertion that he shot Officer Combs under a mistaken belief that the officer was a drug dealer he had recently robbed,[18] it was not unreasonable for the state habeas court to reject Christian's claim that he had been misadvised of the elements of Malicious Assault on a Police Officer.

### 4. Adverse Pretrial Conditions of Confinement

Christian argues that he was subjected to a number of adverse conditions of pretrial confinement, which rendered his guilty plea involuntary. (ECF No. 40 at 80). Among the conditions Christian alleges are mistreatment by several officials, as well as being "assaulted, beaten, threatened, denied medical treatment, subject to (an enormous amount of) secondhand cigarette smoke, and overcrowded/unsanitary conditions." (*Id.*). The state habeas court rejected Christian's claim based upon observation that "Petitioner alleges he was beaten and threatened, however, the amended petition contains only his statements to this effect, and it was only Petitioner's testimony to this effect that took place at the hearing. No photographs, no medical records, and no affidavits of witnesses were attached, nor was any evidence

---

[17] On December 17, 2003, the trial court denied Christian's Motion for Reconsideration of his sentence, on grounds that "[u]pon a review of the plea and sentencing transcript, a copy of which is attached hereto, the Court does find that the plea agreement consisted of the finding of a firearm on all charges. Further consultation with counsel for the State and counsel for the defendant reveals that the plea agreement and sentence were in compliance with the defendant's acceptance thereof." (ECF No. 39-2 at 42).

[18] The undersigned observes that this is contradicted by Tammy Maynard's statements during her taped interview with the Huntington Police Department. (ECF No. 54-5 at 79-80, 83-84).

adduced at the hearing to support Petitioner's claims of beatings and threats (other than Petitioner's testimony to this effect." (ECF No. 39 at 23).

The voluntariness of a guilty plea "can be determined only by considering all of the relevant circumstances surrounding it." *Brady v. United States*, 397 U.S. at 749. Thus, "[t]he mere fact of incarceration does not create duress sufficient to invalidate a plea agreement." *United States v. Cordero*, 1998 WL 852913 at *4 (4th Cir. Dec. 10, 1998). Similarly, "[t]he law is quite clear that a defendant's mere hope or subjective belief of better prison conditions if a guilty plea is entered is insufficient to show that the plea was made involuntarily." *Clemmons v. United States*, 721 F.2d 235, 237 (8th Cir. 1983); *see Foster v. Money*, 2007 WL 3342725, at *18 n.126 (N.D. Ohio Nov. 8, 2007) (collecting cases where defendant alleged pleading guilty due to conditions of confinement). In contrast, "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. at 74; *see United States v. Barrett*, 514 F.2d 1241, 1243 (5th Cir. 1975) (claim that conditions of confinement rendered guilty plea involuntary was contradicted by testimony at plea hearing); *United States v. Weathington*, 507 F.3d 1068, 1073 (7th Cir. 2007) (same); *United States v. Douglas*, 210 Fed. Appx. 771, 775 (10th Cir. 2006) (same).

In Christian's case, the trial court conducted a thorough plea colloquy, during which Christian affirmed that no one was forcing him to enter the plea; that he had not been promised anything other than what was expressed in the plea agreement; and that he was not currently under the influence of any alcohol, drugs or mental defect or disability. (ECF No. 54-6 at 72-73). Based upon these and other assertions, the trial court found that Christian "knowingly and intelligently waived his rights with the adequate assistance of counsel" and "he's not under any coercion nor is he under the

influence of any alcohol, drugs or any mental defect or disability that's affecting his ability to knowingly and intelligently waive his rights and freely and voluntarily enter this plea." (*Id.* at 76-77). Absent clear and convincing evidence to the contrary, Christian is bound by the representations he made during the plea colloquy. *Walton v. Angelone*, 321 F.3d 422, 462 (4th Cir. 2003).

Unfortunately, the evidence supporting Christian's allegations relating to pretrial confinement conditions is decidedly weak. First, Christian provided the state habeas court with information pertaining to a separate and unrelated criminal proceeding against a former corrections officer at Cabell County Jail. (ECF No. 39-2 at 1-5). Although Christian alleges that this same corrections officer also assaulted him, (ECF No. 57-1 at 18), these documents contain no information specific to Christian's confinement. Accordingly, their probative value is significantly limited. Second, Christian offered several affidavits of inmates who had previously been incarcerated at the Cabell County Jail, as well as a 2009 newspaper clipping. (ECF No. 39-2 at 6-9). These documents describe general conditions at the Cabell County Jail, but contain no information specific to Christian's treatment. (*Id.*). Moreover, even assuming the truth of Christian's allegations as to second hand smoke, mattress deprivation, unclean showers, poor air circulation, noise disturbances, and temperature, (ECF No. 39-1 at 26-27), Christian is hard-pressed to demonstrate that these conditions were so egregious as to render his guilty plea involuntary. *See Kyler v. Foshee*, 90 Fed. Appx. 292, 300 (10th Cir. 2004) (finding that § 2254 petitioner's "treatment appears not to have been much more extraordinary than the confinement of other prisoners who are detained against their will pending trial"). Third, Christian provided a Cabell Huntington Hospital urinalysis report in support of his allegation that he was deprived

of medical treatment. (ECF No. 39-2 at 43). However, this report alone does not establish, as Christian alleges, that he had been deprived of medical treatment for 39 days prior to the urinalysis, or that he was subsequently deprived of follow-up treatment. (ECF No. 39-1 at 27). Moreover, the report is dated July 13, 2002, well over a year prior to the date of Christian's guilty plea. (ECF No. 39-2 at 43). Christian does not argue that his medical condition persisted, nor otherwise explains how this incident caused his guilty plea, occurring over one year later, to be involuntary. Fourth, while Christian's allegations of physical assault and abuse occurring "on or around late September 2002" might be cause for concern, (ECF No. 39-1 at 26), there is no way to assess the validity of this claim, as the state habeas court correctly observed that Christian provided no photographs, medical records, affidavits of witnesses, or any other evidence to support his claims. (ECF No. 39 at 23).

During the omnibus hearing, Christian was similarly unable to elicit evidence outside of his own testimony, to support his allegations relating to the conditions of confinement. Trial counsel did not recall Christian ever requesting a motion to change his place of confinement, or even any conversations with Christian regarding the conditions of his confinement. (ECF No. 54-8 at 4). The only conversation that trial counsel recalled apparently took place at an initial meeting, during which Christian related that he had been beaten and threatened during his police interrogation immediately following his arrest. (*Id.*). Trial counsel further testified that he "wouldn't have told [Christian] to plead simply to escape conditions." (*Id.*).

The state habeas court's determination was not unreasonable in light of Christian's sworn testimony at the plea hearing and the limited evidence he produced in support of his claim.

### 5. Totality of Circumstances

Christian argues that the state habeas court failed to consider the totality of the circumstances in assessing whether his guilty plea was voluntary. (ECF No. 57-1 at 19). He contends that instead, the state court relied entirely upon the terms of his plea agreement to conclude that "a defendant who lists such specific conditions as part of a plea does not appear to be entering an involuntary plea." (*Id.*, quoting ECF No. 39 at 24-25). On the contrary, a review of the state habeas court's decision reveals that the specificity of Christian's plea conditions was just one factor supporting the court's determination that Christian's guilty plea was voluntary and intelligent. (ECF No. 39 at 22-25). The court also considered and rejected Christian's claims relating to adverse pretrial conditions, (*Id.* at 23); advisement on his waiver of certain constitutional rights, (*Id.* at 25); advisement on the element of "malice," (*Id.* at 36); and prejudicial statements made by the prosecutor. (*Id.* at 34). The state court did not err in its acknowledged duty to consider the totality of the circumstances in assessing the voluntariness of a guilty plea.

### D. Actual innocence

To the extent Christian maintains that he is actually innocent of Malicious Assault on a Police Officer and the two Armed Robbery offenses to which he pleaded guilty, (ECF No. 40 at 30, 48-50), the undersigned observes that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Royal v. Taylor*, 188 F.3d 239, 243 (4th Cir. 1999) (quoting *Herrera*, 506 U.S. at 400) (rejecting petitioner's claim "that his actual innocence in and of itself renders his conviction . . . violative of the Eighth and

Fourteenth Amendments"). Such a "claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner can pass to have his otherwise barred constitutional claim considered on the merits." *Id.* In Christian's case, however, his claims for habeas relief are not procedurally defaulted. Rather, they have been considered and rejected on the merits.

In addition, the undersigned finds that Christian entered a knowing and intelligent guilty plea; accordingly, he admitted all of the material elements of the charges against him, *United States v. Willis,* 992 F.2d at 490 (citing *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969)), thereby, waiving his right to challenge the factual merits of the charges. *Id.* "[W]hen the judgment of conviction upon a plea of guilty has become final and the offender seeks to reopen the proceeding, 'the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary.'" *Beck v. Angelone,* 173 F.Supp.2d 461 (E.D.Va. 2000) (citing *Willis,* 992 F.2d at 490 (*quoting Broce,* 488 U.S. at 569). Accordingly, Christian's claims of innocence simply do not constitute a valid basis for habeas relief.

### E. Petitioner's Discovery Motions

Finally, the undersigned has considered Petitioner's Motion to Engage in Discovery and Motion for Production of Telephone Records. (ECF Nos. 58, 59). In the first motion, Christian seeks investigative materials prepared or collected by the state during the course of the criminal prosecution; interrogatory responses regarding various aspects of the state's investigation; and the admission of certain facts Christian believes are important in establishing that someone else committed the crimes to which he pled guilty. In the second motion, Christian requests the production of audiotapes allegedly containing recorded conversations he had with his lawyer

approximately two years after he entered his guilty plea, which Christian contends will prove that he never confessed to Henderson that he had committed the armed robberies. Christian argues that the discovery responses will establish that he is actually innocent of the crimes of conviction and will bolster his claims of ineffective assistance of counsel and prosecutorial misconduct. Consequently, he claims to have established good cause for conducting discovery under Rule 6(a) of the Rules Governing Section 2254 Cases.

"[U]nlike other civil litigants, a § 2254 habeas petitioner is not entitled to discovery as a matter of ordinary course." *Stephens v. Branker*, 570 F.3d 198, 213 (4th Cir. 2009) (internal quotations omitted). Rather, the petitioner must show good cause before the Court will authorize discovery on a habeas claim. *Id.* In *Bracy v. Gramley*, the Supreme Court of the United States explained that good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." 520 U.S. 899, 909, 117 S.Ct. 1793, 138 L.Ed2d 97 (1997) (quoting *Harris v. Nelson,* 394 U.S. 286, 300, 89 S.Ct. 1082, 1088-1089, 22 L.Ed.2d 281 (1969)); *See also Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998). In the context of a § 2254 petition, discovery is limited to information necessary to allow adequate inquiry into the petitioner's claims. *Harris,* 394 U.S. at 300.

### 1.  Motion to Engage in Discovery

Christian asserts that information collected in discovery will exonerate him with respect to the armed robberies of the Marathon station and Pizza Hut, as well as the shooting of Officer Combs. (ECF No. 58 at 4-8, 7). However, this contention does not establish good cause for discovery for the simple reason that "actual innocence" is not

an independent ground of federal habeas relief. *See Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Christian also asserts that his Requests for Admissions Nos. 1 through 5 will "bolster his claims of ineffective assistance of counsel and prosecutorial misconduct." (ECF No. 58 at 4).[19] This argument is equally unpersuasive because the information sought would not entitle Christian to habeas relief. The state court made a reasonable determination that Christian's plea was voluntary and intelligent. Accordingly, his claim of prosecutorial misconduct was waived and cannot be resurrected. Moreover, even if Christian collected all of the evidence he seeks in discovery, the state court determined that the investigation performed by counsel was adequate in light of Christian's admission that he had committed the robberies and the assault of Officer Combs. The state court's determination was based upon a well-developed record and was not unreasonable or contrary to federal law.

Christian was afforded a thorough omnibus hearing, during which he elicited extensive testimony from HPD Captain Rocky Johnson regarding the armed robberies, specifically relating to the information he now seeks through the requests for admissions. (ECF Nos. 54-7 at 6-46; 54-8 at 2-18). In addition, Christian supplied both the state habeas court and the West Virginia Supreme Court with voluminous documents reflecting the state's investigation of the crimes. (*See* ECF No. 39-1). Both

---

[19] Christian requests that the State admit or deny that: (1) Joshua Deitz (who has a tattoo on his neck) and Michele Black were arrested for robbing Cricket's Night Club; (2) Michele Black was an employee of Super America gas station, located across the street from the Pizza Hut, at the time of the Pizza Hut robbery; (3) the get-away car used to commit the Pizza Hut and Marathon station robberies was registered to Michele Black at the time of robberies; (4) robbery victim "Angela Davis" did not identify Christian as the individual who robbed the Marathon station; and (5) robbery victim "Jeff Jones" did not identify Christian as the individual who robbed the Pizza Hut. (ECF No. 58-2 at 1-2).

courts thoroughly considered the evidence and rejected Christian's habeas petition.[20] The state habeas court found that Christian had engaged in extensive plea negotiations, personally insisting on certain conditions before he would enter a guilty plea. After reaching an agreement, Christian appeared before the Circuit Court of Cabell County and stated in his own words: "I robbed a Marathon station and a Pizza Hut restaurant." (ECF No. 54-6 at 73). He further admitted to using a firearm in both robberies and then using the firearm again to shoot Officer Combs. (Id. at 73-74). Contrary to Christian's contention, the court found that the plea was not the result of ineffective assistance of counsel, but was entered with full appreciation of the consequences. The undersigned does not find the state court's determination to be unreasonable. Therefore, even if Christian were permitted to serve the proposed discovery requests, the responses would not supply a basis for the court to conclude that Christian was entitled to the relief that he seeks in federal court.

The state courts adjudicated Christian's claims of ineffective assistance of counsel, prosecutorial misconduct, actual innocence, and involuntary guilty plea on the merits. The record before those courts was more than adequate to dispose of Christian's petition. Therefore, the Court's review is limited under § 2254(d)(1) to whether the state court's determination "was contrary to, or involved an unreasonable application of" federal law. The law is well established that when a petitioner seeks habeas review of a claim that a state court adjudicated, federal "review under §

---

[20] Although the state court denied Christian's discovery motion in the State habeas proceedings, the Court explained that "Petitioner's exhibits and other evidence will be considered as they are introduced at Petitioner's omnibus hearing." (ECF No. 39-2 at 94). The state court's denial of Christian's discovery motion was not unreasonable, as Christian was accorded a full opportunity to develop the state record with respect to the factual admissions he seeks here. *See Winston v. Pearson ("Winston II")*, 683 F.3d 489, 497 (4th Cir. 2012) ("[W]hen a state court unreasonably refuses to permit 'further development of the facts' of a claim, de novo review might be appropriate.") Moreover, Christian collected substantial documentation to support his claims, which was submitted and reviewed by the state habeas court and the Supreme Court of Appeals. (*See* ECF No. 39-1).

2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011). Likewise, § 2254(d)(2) by its very terms requires the Court to consider whether the state court's determination of fact was unreasonable "in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

### 2. Motion for Production of Telephone Recordings

Christian seeks copies of digitally recorded telephone conversations that he had with trial counsel in May and June 2005. (ECF No. 59 at 3). Christian argues that these conversations support his contention that he never admitted to trial counsel that he committed any of the charged offenses. (*Id.* at 6-7). Christian contends that his ineffective assistance claims were not adjudicated on the merits because the state habeas court did not hear or consider the telephone recordings.

However, as Christian readily admits, the reason the state court did not consider the telephone recordings is because he never attempted to present them to the state court that adjudicated his claim of ineffective assistance. (*Id.* at 4). At a minimum, Christian must be able to demonstrate that (1) he "requested discovery [or] an evidentiary hearing from the state court to further develop the factual record"; (2) the state court "denied [his] request and passed on the opportunity to adjudicate [his] claim on a complete record"; and (3) "the state court adjudicated a claim that was materially incomplete." *Winston v. Kelly, ('Winston I")*, 592 F.3d 535, 557 (4th Cir. 2010).; *see also Hurst v. Lassiter*, Case No. 1:10-cv-725, 2013 WL 1338862, at *6 (M.D.N.C. Mar. 31, 2013) ("[T]o come within the reach of *Winston I ...* Petitioner must prove that the state court improperly denied him an opportunity to develop the factual record in the face of well-supported requests and that he exercised due diligence in

gathering available information"). As the Fourth Circuit explained in *Winston I*,

> The requirement that § 2254(d) be applied only to claims 'adjudicated on the merits' exists because comity, finality, and federalism counsel deference to the judgments of state courts when they were made on a complete record. In this respect, the 'exhaustion' and 'adjudicated on the merits' elements of federal habeas practice are mirror images. Exhaustion requires that the state courts have an opportunity to apply the law and consider all the evidence relevant to the petitioner's claim.

*Winston I*, 592 F.3d at 555 (internal quotations omitted). Indeed, "the requirements that petitioners exhaust their state remedies and diligently develop the record in state court are exacting burdens." *Winston I*, 592 F.3d at 556; *Winston II*, 683 F.3d at 497.

Christian asserts that through no fault of his own, he only recently learned that the state court had "jurisdiction" to order the production of the telephone recordings, and that had he learned of this earlier, he would have requested that the state court review the telephone recordings.[21] (ECF No. 59 at 5). Even accepting as true Christian's unsupported explanation of his purported diligence, he has clearly failed to demonstrate two of the three crucial requirements underpinning the Fourth Circuit's rationale in adopting the framework outlined in *Winston I.*

Christian has also failed to demonstrate that his ineffective assistance claim was "materially incomplete" as a result of the absence of the phone recordings from the state habeas court's record. First, Christian alleges that the telephone conversations took place "between May and June of 2005." (*Id.* at 3). Christian was convicted in September 2003, long before these conversations occurred. Accordingly, the recordings are of limited probative value in determining whether trial counsel

---

[21] Although not crucial to the Court's determination, the undersigned observes that this assertion is belied by the fact that Christian was assisted by counsel in the state habeas proceeding before the Cabell County Circuit Court. (ECF No. 54-7 at 3). If these telephone recordings were as crucial to his claim as he now asserts, surely Christian would have mentioned them to his habeas counsel, who in turn would have sought their production.

rendered ineffective assistance prior to Christian's guilty plea. Second, although Christian seems to believe that the recordings will bolster his claim "that he had never admitted the alleged crimes to his counsel," he does not represent that the recordings contain an unequivocal concession by trial counsel that Christian denied guilt.[22] (*Id.* at 3-4). At best, Christian offers the conversations as impeachment evidence to undermine the credibility of trial counsel's testimony during the omnibus hearing. The record of the state habeas proceedings reflects that Christian was permitted to fully question counsel regarding the substance of the 2005 conversations, as well as counsel's claim that Christian confessed to the crimes during their initial meeting. Accordingly, the state habeas court heard the evidence and Christian's proffers and concluded that counsel's sworn testimony was the more credible; particularly, as it was supported counsel's written notes prepared at the time of the initial meeting.

The Fourth Circuit has strongly cautioned against overturning state court credibility judgments, particularly with respect to "witnesses whose demeanor has been observed by the state trial court." *Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983)); *Elmore v. Ozmint*, 661 F.3d 783, 850 (4th Cir. 2011). Based upon the information Christian has provided, the phone recordings do not appear sufficiently critical to his claim of ineffective assistance to conclude that the state court's determination was not "adjudicated on the merits." The state habeas court provided a

---

[22] In his motion, Christian represents that the recordings will show the following: (1) counsel acknowledged that Christian tried to enter an *Alford* plea, but was prevented from doing so by the Prosecutor; (2) counsel tried to demonstrate Christian's innocence by looking for the victim of the Marathon robbery; (3) counsel admitted he was unaware of materials in the State's discovery file; (4) counsel was "taken aback" by the content of statements, ballistics test results, photographs, and other documents and by the fact that the State had withheld them; (5) counsel admitted to misplacing copies of the arrest warrants of Dietz and Black supplied to him by Christian; and (6) counsel advised that he had permission to file a motion with the Circuit Court to withdraw Christian's guilty pleas. (ECF No. 59 at 3-4).

well-reasoned, individualized analysis of Christian's claims of ineffective assistance based upon the documentary and testimonial evidence that Christian offered during the lengthy omnibus hearing. The state court's denial of Christian's ineffective assistance claim was clearly adjudicated on the merits. Accordingly, federal review of Christian's claim under § 2254(d) is limited to the record before the state habeas court. *Pinholster*, 131 S.Ct. at 1398. After carefully reviewing the existing record, the content and scope of Christian's discovery requests, and the applicable law, the undersigned **FINDS** that Christian fails to show good cause to conduct discovery in this action.

## V.      <u>Proposal and Recommendations</u>

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** as follows**:**

1.   Respondent's Motion for Summary Judgment (ECF No.  54) be **GRANTED**;

2.   Petitioner's Cross-Motion for Summary Judgment (ECF No. 60) be **DENIED;**

3.   Petitioner's Petition for a Writ of Habeas Corpus by a Person in State Custody (ECF No. 39) be **DENIED**;

4.   Petitioner's Motion to Engage in Discovery (ECF No. 58) be **DENIED**;

5.   Petitioner's Motion for Production of Telephone Recordings by Denied (ECF No. 59) be **DENIED**; and

6.   That this action be **DISMISSED,** with prejudice, and removed from the docket of the court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Petitioner shall have fourteen days (filing of objections) and three days (mailing) from

the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Petitioner, Respondent, and any counsel of record.

**FILED:** June 3, 2013.

Cheryl A. Eifert
United States Magistrate Judge